**Chad McKINNEY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0606–CR–494.

Court of Appeals of Indiana.

Sept. 17, 2007.

Ruth Johnson, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

After his first trial for murder resulted in a hung jury, Chad McKinney ("McKinney") was retried, convicted, and sentenced to fifty-five years in prison. On appeal, he contends that the trial court clearly erred in denying his motion for change of judge, that the trial court abused its discretion in denying his motion for mistrial, that the prosecutor committed misconduct by failing to notify the defense of changes in the testimony of certain witness from the first trial to the second trial, that the evidence is insufficient to support his conviction, that the trial court abused its discretion in refusing to instruct the jury on the lesser included offenses of reckless homicide and criminal recklessness, that the trial court abused its discretion in sentencing him, and that his sentence is inappropriate in light of the nature of the offense and his character. Because McKinney's motion for change of judge was not filed within ten days of his plea of not guilty in accordance with Indiana Rule of Criminal Procedure 12(D), the trial court did not clearly err in denying it. We affirm the judgment of the trial court in this and all other respects.

### Facts and Procedural History

On the night of December 19, 2003, Dominick Bruno ("Dominick") and Anthony Laurenzo ("Laurenzo"), who had been a groomsman in Dominick's wedding, procured some LSD and then went to Dancer's Show Club in Indianapolis. Both men consumed some of the LSD before entering the club. After a few minutes, Laurenzo began acting abnormally, alternating between periods of quiet with his head between his knees and periods where he had a great deal of energy, was shaking, and was yelling, "Oh, Jesus." Tr. p. 222. The club's doorman saw Laurenzo crying and rubbing his chest and believed that Laurenzo was hallucinating. Eventually, the doorman asked Dominick to take Laurenzo out of the club.

About that time, Dominick received a call from his wife, Connie. Connie, who was eight-and-a-half months pregnant, was at the couple's trailer home with their young son, Joseph. Connie told Dominick that McKinney, who had also been a groomsman in Dominick's wedding, was at the home and needed to see him. According to Connie, McKinney had been drinking whiskey and seemed sad. Dominick and Laurenzo left the club and drove to the Brunos' home. During the drive, Laurenzo was swinging his arms and talking with God and Jesus. Twice during the drive, Dominick pulled over to calm Laurenzo.

After they arrived at Dominick's home, Dominick led Laurenzo inside. McKinney was lying on the floor near the door, and Laurenzo stepped on him. Laurenzo was still swinging his arms, and he hit McKinney. McKinney pulled Laurenzo onto a

couch and started hitting him before Dominick and Connie separated them. Dominick told McKinney that Laurenzo was "on a bad trip" from the LSD, that he was "not trying to hurt nobody," and that McKinney should leave him alone. *Id.* at 230. At that point, Laurenzo was foaming at the mouth and claiming that he was God and "the most powerful man in the world." *Id.* at 77–78. Connie tried to give Laurenzo a glass of milk, but Laurenzo threw it or knocked it out of her hand. Dominick left the room to check on Joseph and returned to find McKinney beating Laurenzo up again, and Dominick again separated the two.

McKinney eventually left the trailer, but he returned approximately ten minutes later with a purple Crown Royal bag and a white glove. By that point, Laurenzo had "actually started to listen" to Dominick "a little bit." *Id.* at 232. Nonetheless, McKinney removed a small pistol from the purple bag and pointed it at Laurenzo. McKinney then fired a shot while the gun was pointed at the ground. Dominick told McKinney, "Look, you just shot a bullet. You need to go. I got a son here, I've got a pregnant wife. You know this is not good. You need to leave now." *Id.* at 236–37. McKinney placed the gun on an entertainment center but did not leave. Laurenzo was still standing and claiming to be God and the most powerful man in the world. Connie told Laurenzo to sit down, and Laurenzo approached her "like he was going to hit [her] or something." *Id.* at 88. Connie told Laurenzo, "I'm pregnant and you're not going to hit me," and Laurenzo did not do anything to her. *Id.*

Connie then called 911 to get help for Laurenzo. While she was on the phone, McKinney approached Laurenzo, put him in a headlock, pushed the gun against his temple, and shot him in the head. Laurenzo immediately fell to the floor. Dominick saw McKinney drop the gun, and McKinney left the trailer. Laurenzo died of "a through-and-through contact gunshot wound to the head." *Id.* at 322. Dominick and Connie gave statements to the police and identified McKinney as the shooter. Police found a gun broken into several pieces on the floor of the trailer.

After McKinney was arrested, he reported to a doctor at the Marion County Jail that he had a bullet lodged in his hand. He subsequently removed the bullet himself using a razor blade and gave it to a guard. Testing showed that the bullet had been fired from the gun recovered by police. Furthermore, McKinney's wound was consistent with the exit wound on Laurenzo's head because the exit wound indicated that something was resting against Laurenzo's skin, possibly McKinney's hand. Finally, DNA testing showed that Laurenzo's blood was on the barrel of the recovered gun and on McKinney's jacket.

The State charged McKinney with murder, a felony.[1] A jury trial was held on August 15–17, 2005. During the noon recess on August 15, Judge Patricia Gifford ("Judge Gifford") became aware that Laurenzo's mother had worked for her in the early 1980s. Judge Gifford brought counsel into her chambers and advised them of her former relationship with Laurenzo's mother. McKinney's attorney indicated that she had known this information from the beginning and had not asked for recusal because she felt that Judge Gifford is fair.

During the trial, Connie testified that she heard a "pop" then looked over and saw Laurenzo falling. Ex. p. 304. The

1. Ind.Code § 35–42–1–1.

prosecutor asked Connie whether she saw a gun at that point, and she said "no." *Id.* at 305. Regarding Dominick's testimony that McKinney dropped the gun to the floor after shooting Laurenzo and the fact that the gun was found in several pieces on the floor, David Brundage ("Brundage"), the State's firearms expert, was asked whether dropping the weapon would cause it to fall apart. He responded:

> Not in my opinion. One, the magazine has to be out of the gun. Two, the safety has to be forward or to a firing position, then the slide has to be drawn all the way back before it can be lifted up and in my opinion that couldn't be done with—in a dropping situation. Has to be—that would have to be done on purpose.

*Id.* at 614–15. On August 17, 2005, the last day of the trial, the jury was unable to reach a verdict, and the trial court declared a mistrial and scheduled another pre-trial conference.

Two days later, McKinney's attorney filed a motion asking Judge Gifford to grant a change of judge pursuant to Indiana Rule of Criminal Procedure 12(B) ("Criminal Rule 12(B)") based upon Judge Gifford's former relationship with Laurenzo's mother. Judge Gifford denied the motion, finding that McKinney had failed to file it within ten days of his plea of not guilty as required by Indiana Rule of Criminal Procedure 12(D) ("Criminal Rule 12(D)") and that "[n]o facts have been alleged that would cause an objective person to have a reasonable basis for doubting the judge's impartiality[.]" Appellant's Supp.App. p. 3.

The second jury trial commenced on April 24, 2006. When the prosecutor asked Connie whether she saw a gun after hearing a gunshot, she testified, in contrast to her testimony at the first trial, "When [McKinney] turned around—when he turned around he had his hands—he opened his hands like this and he said, 'What do you want me to do?' And the gun fell and hit the floor." Tr. p. 91. On cross-examination, McKinney's counsel asked Connie whether her testimony "differs radically" from her testimony during the first trial, and Connie responded, "Yes." *Id.* at 140. This exchange led to the following question from the jury: "[I]f your testimony is different today than it was previously, why did you change it?" *Id.* at 142. Connie answered, "Because I was assured that no matter what happened, me and my children were going to be safe." *Id.* McKinney's counsel immediately moved for a mistrial, arguing that Connie's response to the jury's question implied that McKinney is dangerous and had threatened her. The trial court denied the motion. Later in the trial, the defense called Connie as a witness and asked her whether McKinney had ever threatened her, and she said, "No." *Id.* at 583.

Dominick also gave new testimony at the second trial. Specifically, he testified that before McKinney shot Laurenzo, McKinney had said, referring to Laurenzo, "We don't need him anymore" and that McKinney had put the gun in Laurenzo's mouth and said, "Do you want me to blow your head off, m* * * * * f* * * * *?" *Id.* at 234.

Brundage again served as the State's firearms expert during the second trial. During the course of the testimony, he disassembled the gun and realized, contrary to his testimony at the first trial, that it could be disassembled without the magazine having been removed. When asked again whether dropping the gun would cause it to break into pieces, he responded, contrary to his testimony at the first trial, "Not normally, but in my business anything can happen, and I would

never want to be totally conclusive that it could never happen." *Id.* at 544. When asked whether he was changing his testimony, Brundage replied, "I would have to change that at this time to reflect that the magazine does not have to be in the gun, or out of the gun." *Id.* at 545. The prosecution did not notify the defense of any of these changes in testimony.

McKinney tendered lesser included offense instructions for the crimes of reckless homicide and criminal recklessness. The trial court refused to give the instructions, concluding that the evidence would not support convictions for these offenses. The jury found McKinney guilty of murder. Judge Gifford made the following statement at the sentencing hearing:

> I think it's unlikely to believe that the victim facilitated this crime by his actions since it was very much in evidence that he was not in control of his actions, that [McKinney] acted under a strong provocation. The evidence did show that he did go out and get the gun and return after a period of time. That circumstances are not likely to happen again. These circumstances aren't, but I'm not sure that another set might not. I would agree that in fact it might be a hardship to his children, however, I've not really seen any evidence that he was financially supporting the children. I'm not sure that they need his other support. There was one mitigator, the fact that his criminal history is minimal, at best. However, taking into consideration the evidence presented to the jury in which they found [McKinney] knowingly killed the victim in this matter, would override any mitigation[.]

Tr. p. 624–25. Judge Gifford sentenced McKinney to a prison term of fifty-five years, the presumptive sentence for murder. McKinney now appeals.

## Discussion and Decision

On appeal, McKinney raises the following issues: (1) whether the trial court's denial of McKinney's motion for change of judge was clearly erroneous; (2) whether the trial court abused its discretion by denying McKinney's motion for mistrial; (3) whether the prosecutor committed misconduct by failing to notify the defense of the changes in testimony; (4) whether the evidence is sufficient to support McKinney's conviction; (5) whether the trial court abused its discretion in refusing to give the lesser included offense jury instructions on the offenses of criminal recklessness and reckless homicide; and (6) whether the trial court properly sentenced McKinney.

### I. Motion for Change of Judge

■ McKinney first argues that Judge Gifford erred in denying his motion for change of judge. Indiana Rule of Criminal Procedure 12(B) provides:

> In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. The party shall timely file an affidavit that the judge has a personal bias or prejudice against the state or defendant. The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice.

We will reverse a trial judge's decision on a motion for change of judge under Indiana Criminal Rule 12 only if it is clearly erroneous, that is, when we are left with a definite and firm conviction that a mistake has been made. *Sturgeon v. State,* 719 N.E.2d 1173, 1182 (Ind.1999).

■ Here, McKinney contends that Judge Gifford was biased or prejudiced against him because Laurenzo's mother was a former employee of Judge Gifford. As an initial matter, we note that Judge Gifford denied McKinney's motion because she concluded that it was not timely filed. Criminal Rule 12(D) provides, in part:

**(D) Time Period for Filing Request for Change of Judge or Change of Venue.** In any criminal action, no change of judge or change of venue from the county shall be granted except within the time herein provided.

(1) *Ten Day Rule.* An application for a change of judge or change of venue from the county shall be filed within ten (10) days after a plea of not guilty, or if a date less than ten (10) days from the date of said plea, the case is set for trial, the application shall be filed within five (5) days after setting the case for trial. . . .

McKinney argues that Judge Gifford erred in denying his motion based on the ten-day rule because that time period began anew when the first trial ended in a mistrial. In other words, McKinney argues that the motion was timely "as it related to the second trial." Appellant's Br. p. 2. We cannot agree.

Criminal Rule 12(D) explicitly gives the parties ten days from the date on which the defendant pleads not guilty to request a change of judge. Here, McKinney pled not guilty on December 23, 2003, and re-quested a change of judge on August 19, 2005. The only exception to the ten-day rule is "subsequently discovered grounds." Criminal Rule 12(D)(2) provides, in pertinent part:

If the applicant first obtains knowledge of the cause for change of venue from the judge or from the county after the time above limited, the applicant may file the application, which shall be verified by the party specifically alleging when the cause was first discovered, how it was discovered, the facts showing the cause for a change, and why such cause could not have been discovered before by the exercise of due diligence. . . .

McKinney does not allege any subsequently discovered grounds in this case. Indeed, it is undisputed that the ground claimed by McKinney in his request for change of judge—Judge Gifford's former work relationship with Laurenzo's mother—was known to all parties at the beginning of the first trial. Furthermore, McKinney's attorney specifically indicated that recusal was unnecessary because Judge Gifford is fair. And the fact that McKinney had to be retried has no effect on the operation of Criminal Rule 12(D); he was still being tried on the same charge and under the same cause number. He had a clear opportunity to invoke the subsequently discovered grounds exception during the first trial, and he declined. We will not sanction a second bite at the apple.[2] *See Flowers v. State,* 738 N.E.2d

---

**2.** McKinney directs us to *Denton v. State,* 496 N.E.2d 576 (Ind.1986), *reh'g denied,* in support of his argument that his motion for change of judge was timely filed. In *Denton,* after the defendant's habitual offender finding was vacated, the State filed a motion for retrial. The defendant moved for a change of judge more than three months later. The trial court denied the motion, and the defendant appealed. In determining that the trial court had not abused its discretion in denying the defendant's motion, the Indiana Supreme Court stated, "The criminal rule mandates that a defendant must move for a change of judge within ten days after being advised of the charge and entering a plea of not guilty. Appellant had notice of the renewed habitual offender charge and of the date for retrial on that issue fully three months before his motion for change of judge was filed." *Denton,* 496 N.E.2d at 583. Though the defendant in *Denton* did not prevail, McKinney urges that

1051, 1059 (Ind.2000) ("The law is settled that a defendant is not entitled to a change of judge where the mandates of Criminal Rule 12 have not been followed."), *reh'g denied.*

■ Furthermore, even if McKinney's motion had been timely filed, he failed to make a showing of bias or prejudice. "The law presumes that a judge is unbiased and unprejudiced." *Garland v. State,* 788 N.E.2d 425, 433 (Ind.2003). Under Criminal Rule 12, "[a] party is entitled to a change of judge only if the historical facts recited in the affidavit support a rational inference of bias or prejudice." *Voss v. State,* 856 N.E.2d 1211, 1216 (Ind.2006) (quoting *Allen v. State,* 737 N.E.2d 741, 743 (Ind.2000)). McKinney argues that "[t]he personal relationship between the judge and her former employee support a rational inference of bias and prejudice." Appellant's Br. p. 8. However, approximately twenty years had passed since Laurenzo's mother had worked with Judge Gifford, and McKinney's affidavit did not allege any facts suggesting that any relationship existed between the two after that employment was terminated. *See Bixler v. State,* 471 N.E.2d 1093, 1100–01 (Ind. 1984) (defendant not entitled to change of judge where trial judge went to same church as victim's family and had drawn up will some years earlier for step-father of victim's mother). Furthermore, the fact that Judge Gifford imposed a sentence in excess of the minimum does not, as McKinney contends, "reflect bias against McKinney and sympathy for the victim's family." *Id.* at 9. As discussed further in Section VI of this opinion, McKinney's sentence is justified by the heinous nature of his crime and the existence of only one mitigating circumstance. *See Johnson v. State,* 472 N.E.2d 892, 911 (Ind.1985) (holding that imposition of lengthy sentences did not show prejudice where sentences were warranted by facts shown in the evidence), *reh'g denied.* Judge Gifford's denial of McKinney's motion for change of judge was not clearly erroneous.

## II. Motion for Mistrial

McKinney next argues that the trial court abused its discretion in denying his motion for a mistrial based upon Connie's response to the jury's question as to why Connie changed her testimony to reflect that she saw McKinney drop a gun after she heard the second gunshot. Connie answered, "Because I was assured that no matter what happened, me and my children were going to be safe." Tr. p. 142. McKinney contends that the trial court should have granted the motion for mistrial because Connie's response to the jury's question left the jury "with the lingering impression that McKinney had threatened her and was dangerous." Appellant's Br. p. 11.

■ A mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation. *Shouse v. State,* 849 N.E.2d 650, 655 (Ind.Ct.App.2006), *trans. denied.* On appeal, we afford great deference to the trial judge's discretion in determining whether to grant a mistrial because the judge is in the best position to gauge the

---

the language used by our Supreme Court indicates that the Criminal Rule 12 clock, *i.e.,* the ten-day rule, "starts over upon a retrial[.]" Appellant's Reply Br. p. 3. We cannot agree that *Denton* stands for such a broad proposition. Indeed, our Supreme Court limited its holding to the facts of the case by stating, "This case is unusual procedurally, in that appellant was tried solely on the issue of his habitual offender status several years after his conviction on the underlying felony charge." *Denton,* 496 N.E.2d at 583. The current case involves neither a habitual offender charge nor a gap of several years between trials. *Denton* is inapposite.

surrounding circumstances of an event and its impact on the jury. *Id.* We therefore review the trial court's decision solely for abuse of discretion. *Id.* "To prevail on appeal from the denial of a motion for mistrial, the defendant must establish that the questioned conduct 'was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected.'" *Id.* (quoting *Mickens v. State,* 742 N.E.2d 927, 929 (Ind.2001)). The gravity of the peril is determined by considering the probable persuasive effect of the misconduct on the jury's decision, not the impropriety of the conduct. *Id.*

We conclude that any error in allowing Connie to explain the conflict in her testimony was largely cured when McKinney's counsel asked Connie later in the trial whether McKinney had ever threatened her, and Connie answered, "No." Tr. p. 534. This clarification sufficiently mitigated any peril in which McKinney was placed. *See Donnegan v. State,* 809 N.E.2d 966, 973 (Ind.Ct.App.2004) (where there was no evidence in record regarding whether State's witness had taken polygraph examination, it was misconduct for prosecutor to say that witness had not taken polygraph, but misconduct did not subject defendant to grave peril because prosecutor then clarified that there was no evidence in record on issue), *trans. denied.*

Furthermore, "[a] trial error may not require reversal where its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect a party's substantial rights." *Bassett v. State,* 795 N.E.2d 1050, 1054 (Ind.2003). Dominick testified that he watched McKinney walk up to Laurenzo, put him in a headlock, and shoot him in the head. Dominick and Connie gave statements to the police and identified McKinney as the shooter. Police found a gun broken into several pieces on the floor of the trailer. Testing showed that the bullet lodged in McKinney's hand had been fired from the gun recovered by police. Furthermore, McKinney's wound was consistent with the exit wound on Laurenzo's head because the exit wound indicated that something was resting against Laurenzo's skin. Finally, DNA testing showed that Laurenzo's blood was on the barrel of the recovered gun and on McKinney's jacket. In light of the overwhelming evidence against McKinney, any error in allowing Connie's response to the jury's question was harmless.

## III. Prosecutorial Misconduct

McKinney also argues that "[c]hanges in testimony of key witnesses and the failure to notify the defense resulted in a denial of due process." Appellant's Br. p. 9. Specifically, McKinney asserts that the prosecutor committed misconduct by failing to notify the defense that Connie and other witnesses would be changing their testimony from the first trial to the second trial. In addition to Connie's changed testimony about the gun, McKinney directs us to Dominick's testimony at the second trial that McKinney, referencing Laurenzo, had said, "We don't need him anymore" and had put the gun in Laurenzo's mouth and said, "Do you want me to blow your head off, m* * * * * f* * * * *?" Tr. p. 234. McKinney claims that Dominick did not testify to any such statements during the first trial.

McKinney acknowledges that his trial counsel did not make contemporaneous objections during the second trial to the changes in Dominick's and Connie's testimony. "A party's failure to present a contemporaneous trial objection asserting prosecutorial misconduct precludes appellate review of the claim." *Booher v. State,* 773 N.E.2d 814, 817 (Ind.2002). As such,

McKinney argues that the prosecutorial misconduct amounts to fundamental error. *See id.* ("Such default may be avoided if the prosecutorial misconduct amounts to fundamental error."). In such a situation, the defendant must establish not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error. *Id.* at 818. "In reviewing a properly preserved claim of prosecutorial misconduct, we would 'determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected.'" *Id.* at 817 (quoting *Coleman v. State,* 750 N.E.2d 370, 374 (Ind.2001)). But for prosecutorial misconduct to constitute fundamental error, it must also " 'make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process [and] present an undeniable and substantial potential for harm.'" *Id.* (quoting *Benson v. State,* 762 N.E.2d 748, 756 (Ind.2002)).

■ With regard to the changes in Dominick's and Connie's testimony, we need not reach the question of fundamental error because we conclude that the prosecutor did not commit any misconduct. McKinney does not dispute the State's contention that the prosecution only has an affirmative duty to disclose evidence favorable to the defendant. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The new testimony from Dominick and Connie was not favorable to McKinney. Dominick testified at the second trial as to vulgar, inculpatory utterances by McKinney ("We don't need him anymore" and "Do you want me to blow your head off, m* * * * * f* * * * *?"), and Connie testified that after she heard the second gunshot, she saw McKinney open his hands and saw the gun fall to the floor. Because this evidence was inculpatory rather then exculpatory, the prosecution did not breach its duty under *Brady* to disclose evidence favorable to the defendant and therefore did not commit prosecutorial misconduct.

■ McKinney also maintains that the prosecution committed misconduct by failing to disclose the change in the testimony of Brundage, the State's firearms expert. Brundage testified during the first trial that the gun—which was found on the floor of the trailer in several pieces—could not have broken apart merely by being dropped on the floor, but he testified during the second trial that dropping the gun could have caused it to break apart. McKinney again acknowledges that his trial counsel did not make a contemporaneous objection to this change during the second trial, and he again seeks to invoke the fundamental error doctrine.

■ The change in Brundage's testimony presents a closer question. Brundage's new testimony, like that of Dominick and Connie, was not favorable to McKinney, so the failure to disclose the changes did not violate McKinney's constitutional rights under *Brady.* However, prosecutors have a separate duty, under Indiana Trial Rule 26(E)(1), "to seasonably supplement discovery responses with respect to the subject-matter and substance of an expert witness' expected testimony." *Camm v. State,* 812 N.E.2d 1127, 1141 (Ind.Ct.App.2004), *trans. denied.* Here, though, the State had no way of knowing that Brundage would change his testimony. In fact, Brundage himself did not realize that his testimony during the first trial was inaccurate until he was in the middle of testifying during the second trial, when he concluded that the gun could be disassembled without removing the magazine. Because the State could not have known until Brundage was on the

stand that his opinion would change, it is axiomatic that it did not commit misconduct by failing to notify the defense of this change, and we need not reach the question of fundamental error.

## IV. Sufficiency of the Evidence

 Next, McKinney argues that the evidence is insufficient to support his murder conviction. Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005). We must consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* We must affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

McKinney's entire argument is based on the fact that Dominick's, Connie's, and Brundage's testimony during the second trial was not entirely consistent with their testimony during the first trial. Based on these differences, McKinney asserts that these three witnesses are "unreliable." Appellant's Br. p. 16. In light of the overwhelming evidence discussed above, we need not belabor this point. We simply note that whether a witness is reliable is a pure question of credibility, and McKinney is asking us to judge the credibility of witnesses. This we clearly cannot do. *See McHenry*, 820 N.E.2d at 126.

 In a separate argument, McKinney urges that the State failed to put forth sufficient evidence to rebut his claim of self-defense and defense of others. "A valid claim of defense of oneself or another person is legal justification for an otherwise criminal act." *Wilson v. State*, 770 N.E.2d 799, 800 (Ind.2002). However, the force used must be proportionate to the requirements of the situation. *Geralds v. State*, 647 N.E.2d 369, 373 (Ind.Ct.App. 1995), *trans. denied.* Under the self-defense statute in effect at the time of McKinney's offense, deadly force was justified "only if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." Ind.Code § 35-41-3-2(a) (2004).[3]

McKinney asserts that his actions "were in defense of Connie and Joseph[,] and he harbored a reasonable fear that either himself, Dominick, Connie[,] or Joseph were [sic] in danger of great bodily harm from [Laurenzo]." Appellant's Br. p. 18. McKinney focuses on Connie's testimony that Laurenzo walked toward her "like he was going to hit [her] or something." Tr. p. 88. However, Connie also testified that she then said to Laurenzo "I'm pregnant and you're not going to hit me" and that Laurenzo did not hit her. *Id.* It was not until after this point, when Laurenzo's aggression toward Connie had ceased, that McKinney put Laurenzo in a headlock, placed the gun against his temple, and shot him in the head. Based on this evidence, the jury could have reasonably concluded that the deadly force used by McKinney was not proportionate to the requirements of the situation. *See Geralds*, 647 N.E.2d at 373.

## V. Jury Instructions

 Next, McKinney maintains that the trial court abused its discretion in refusing to instruct the jury on reckless homicide and criminal recklessness as less-

---

**3.** Our General Assembly made several amendments to Indiana Code § 35-41-3-2 in 2006, but those amendments are not relevant to our discussion. *See* P.L. 189-2006, § 1.

er included offenses of murder. As the Indiana Supreme Court has stated:

> A requested instruction for a lesser included offense of the crime charged should be given if the lesser included offense is either inherently or factually included in the crime charged, and if, based upon the evidence presented in the case, there existed a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense such that a jury could conclude that the lesser offense was committed but not the greater.

*Ellis v. State*, 736 N.E.2d 731, 733 (Ind. 2000) (citing *Wright v. State*, 658 N.E.2d 563, 567 (Ind.1995)) (formatting altered). Both reckless homicide and criminal recklessness causing death are inherently lesser included offenses of murder. *Miller v. State*, 720 N.E.2d 696, 702–03 (Ind.1999). As such, the only issue to be determined is whether there existed a serious evidentiary dispute about whether McKinney killed Laurenzo knowingly—the mental state alleged in the charging information—or merely recklessly. The trial court determined that there was no such dispute. We must agree.

■ When an instruction is refused on grounds that there is no serious evidentiary dispute, we review that refusal for an abuse of discretion. *Id.* at 702. Reckless conduct is action taken in "plain, conscious, and unjustifiable disregard of harm that might result." Ind.Code § 35–41–2–2(c). That disregard must involve a substantial deviation from the acceptable standards of conduct. *Id.* In contrast, a person engages in conduct "knowingly" if the person "is aware of a high probability that he [or

she] is doing so." Ind.Code § 35–41–2–2(b). Here, the evidence shows that McKinney held a gun to Laurenzo's head and pulled the trigger. It cannot be seriously disputed that he did so with at least an awareness of a high probability that he would kill Laurenzo. *See, e.g., Sanders v. State*, 704 N.E.2d 119, 122–23 (Ind.1999) (no serious evidentiary dispute about whether defendant committed murder instead of reckless homicide where defendant killed victim by firing a handgun directly at victim at close range). The trial court did not abuse its discretion in refusing to instruct the jury on the lesser included offenses of reckless homicide and criminal recklessness.

## VI. Sentencing

■ Finally, McKinney challenges his sentence.[4] The murder sentencing statute in effect at the time of McKinney's crime provided that "[a] person who commits murder shall be imprisoned for a fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances." Ind.Code § 35–50–2–3 (2003). The trial court sentenced McKinney to the presumptive term of fifty-five years. McKinney contends that the trial court abused its discretion in identifying the aggravating and mitigating circumstances and that his sentence is inappropriate in light of the nature of his offense and his character.

### A. Aggravators and Mitigators

■ McKinney challenges the trial court's finding of aggravating and mitigat-

---

4. Between the date of McKinney's offense, December 19, 2003, and the date of sentencing, May 17, 2006, the General Assembly replaced the former presumptive sentencing scheme with the current advisory sentencing scheme. *See* P.L. 71–2005 (eff. April 25, 2005). Nonetheless, because "the sentencing statute in effect at the time a crime is committed governs the sentence for that crime," *Gutermuth v. State*, 868 N.E.2d 427, 431 n. 4 (Ind.2007), we address McKinney's sentence under the presumptive sentencing scheme.

ing circumstances. In general, sentencing lies within the discretion of the trial court. *Henderson v. State*, 769 N.E.2d 172, 179 (Ind.2002). As such, we review sentencing decisions only for an abuse of discretion, "including a trial court's decision to increase or decrease the presumptive sentence because of aggravating or mitigating circumstances." *Id.*

 McKinney first argues that the trial court abused its discretion in identifying as an aggravating circumstance the fact the McKinney knowingly killed Laurenzo. McKinney directs us to the trial court's statement that "taking into consideration the evidence presented to the jury in which they found [McKinney] knowingly killed the victim in this matter, would override any mitigation[.]" Tr. p. 625. McKinney is correct that the knowingly *mens rea* is an element of the crime with which McKinney was charged and that "[a] factor constituting a material element of a crime cannot be considered an aggravating circumstance in determining sentence." *Johnson v. State*, 687 N.E.2d 345, 347 (Ind. 1997). However, "[t]he particular manner in which a crime is committed may serve as an aggravating factor." *Id.* Here, when the trial court commented on the "evidence presented to the jury," it was essentially commenting on the particular manner in which the crime was committed, that is, an execution-style killing. Therefore, McKinney's assertion that the trial court relied upon his *mens rea* as an aggravating circumstance is without merit.

 McKinney next maintains that the trial court abused its discretion in failing to find several significant mitigating circumstances. The finding of mitigating factors is within the discretion of the trial court. *Cotto v. State*, 829 N.E.2d 520, 525 (Ind.2005). A trial court is not obligated to weigh or credit the mitigating factors in the manner a defendant suggests they

should be weighed or credited. *Id.* "The allegation that the trial court failed to find a mitigating circumstance requires [the defendant] to establish that the mitigating evidence is both significant and clearly supported by the record." *Plummer v. State*, 851 N.E.2d 387, 391 (Ind.Ct.App. 2006).

 McKinney contends that the trial court should have found as a mitigating circumstance the fact that his incarceration will result in undue hardship on his children. We reject this argument for two reasons. First, as the trial court noted, McKinney did not present any evidence that he was supporting his children financially. *See* Tr. p. 624. McKinney does not direct us to any such information on appeal. Second, McKinney fails to explain how the minimum sentence of forty-five years would cause any less hardship on his children than the fifty-five-year presumptive sentence actually imposed. Indeed, the difference between those two sentences "hardly can be argued to impose much, if any, additional hardship" on McKinney's children. *See Abel v. State*, 773 N.E.2d 276, 280 (Ind.2002). Therefore, the trial court did not abuse its discretion in refusing to find the hardship on McKinney's children as a mitigating circumstance.

 McKinney also asserts that the trial court abused its discretion by failing to find as a mitigating circumstance the fact that Laurenzo's "drug induced aggression ... facilitated the crime." Appellant's Br. p. 24. It is undisputed that Laurenzo was incapacitated and acting out. However, Dominick told McKinney multiple times that Laurenzo did not intend to hurt anybody and that he was only having a negative reaction to the drugs in his system. In addition, McKinney had several opportunities to remove himself from

the situation. At one point he did leave, only to return with the gun and shoot Laurenzo. To the extent that McKinney was provoked by Laurenzo, we noted above that the jury could have reasonably concluded that the deadly force used by McKinney was not proportionate to the requirements of the situation. *See Geralds,* 647 N.E.2d at 373. The trial court did not abuse its discretion in failing to find as an mitigating circumstance that Laurenzo facilitated the crime.

■ Finally, McKinney maintains that the trial court abused its discretion by failing to consider his "steady employment" as a mitigating circumstance. Appellant's Br. p. 24. However, McKinney did not proffer this mitigating circumstance to the trial court. As such, he has waived consideration of this circumstance. *Pennington v. State,* 821 N.E.2d 899, 905 (Ind.Ct.App.2005) ("A defendant who fails to raise proposed mitigators at the trial court level is precluded from advancing them for the first time on appeal."). Waiver notwithstanding, while the State acknowledges that McKinney has been regularly employed, this is not necessarily a significant mitigating factor. *See Newsome v. State,* 797 N.E.2d 293, 301 (Ind.Ct. App.2003) ("Many people are gainfully employed such that this would not require the trial court to note it as a mitigating factor[.]"), *trans. denied.* Furthermore, other than providing his dates and places of employment, McKinney presented no information regarding his performance or reasons for termination. *See Bennett v. State,* 787 N.E.2d 938, 948 (Ind.Ct.App. 2003) (rejecting employment history mitigator where defendant did not present a specific work history, performance reviews, or attendance records), *trans. denied.* The trial court did not abuse its discretion in failing to find McKinney's employment history as a mitigating circumstance.

## B. Appropriateness

■ McKinney also argues that his sentence is inappropriate in light of the nature of his offense and his character. Indiana Rule of Appellate Procedure 7(B) states: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light. of the nature of the offense and the character of the offender." "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Purvis v. State,* 829 N.E.2d 572, 587 (Ind.Ct. App.2005) (internal citations omitted), *trans. denied, cert. denied,* 547 U.S. 1026, 126 S.Ct. 1580, 164 L.Ed.2d 310 (2006). The defendant has the burden of persuading us that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006). After due consideration of the trial court's decision, we cannot say that McKinney's sentence is inappropriate.

■ As an initial matter, we note McKinney's contention that "this offense is not the worst offense and McKinney is not the worst offender." Appellant's Br. p. 22. McKinney is apparently alluding to the proposition that "[m]aximum sentences are reserved for the worst offenders and offenses." *Johnson v. State,* 830 N.E.2d 895, 898 (Ind.2005). But the trial court did not impose the maximum sentence. The maximum sentence for murder is sixty-five years, and the trial court sentenced McKinney to the presumptive term of fifty-five years. The presumptive sentence

is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Childress,* 848 N.E.2d at 1081. Therefore, when the trial court imposes the presumptive sentence, the defendant bears a heavy burden in persuading us that his or her sentence is inappropriate.

There is nothing particularly appalling about McKinney's character. His criminal record consists only of arrests for misdemeanor crimes, none of which was ever reduced to a conviction. However, McKinney's crime was strikingly brutal. What started off as a relatively minor scuffle between two friends turned tragic when McKinney drew a firearm and shot Laurenzo in the head at point blank range. One last time, we reiterate that even if Laurenzo's own behavior provoked McKinney, the deadly force used by McKinney was not proportionate to the requirements of the situation. In light of the heinous nature of McKinney's crime, we cannot say that the presumptive sentence of fifty-five years is inappropriate.

Affirmed.

ROBB, J., and BRADFORD, J., concur.