## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 10 2019, 8:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mark K. Leeman
Logansport, Indiana

Kevin E. Milner
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Lyubov Gore
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Charles E. Bayne III,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

June 10, 2019

Court of Appeals Case No.
18A-CR-1290

Appeal from the Lake Superior Court

The Honorable Salvador Vasquez, Judge

Trial Court Cause No.
45G01-1707-MR-5

**Mathias, Judge.**

[1] Following a jury trial in Lake Superior Court, Charles E. Bayne III ("Bayne") was convicted of Level 2 felony voluntary manslaughter. Bayne then admitted

to the sentencing enhancement of using a firearm during the offense. The trial court sentenced Bayne to fifteen years of incarceration on the voluntary manslaughter conviction and to five years in community corrections for the firearm enhancement. On appeal, Bayne presents two issues, which we restate as: (1) whether the State presented sufficient evidence to support his conviction for voluntary manslaughter and to rebut his claim of self-defense, and (2) whether the trial court erred as a matter of law in sentencing Bayne on the firearm enhancement.

[2] We affirm.

## Facts and Procedural History

[3] The victim in this case, Cody Klotz ("Cody") had been in a relationship with Emily Kurczynski ("Emily") for almost five years before their relationship ended in May 2017. Their relationship involved domestic violence. The following month, Emily began to date the defendant Bayne. Despite the breakup, or perhaps because of it, Cody sent Emily "mean-spirited" and "inappropriate" text messages. Tr. Vol. 2, p. 104. Emily therefore blocked Cody's number so that he could no longer send her messages directly.

[4] On July 13, 2017, Cody was hanging out with friends, including his new girlfriend, Nikki Karner ("Nikki") and Tyler Kampe ("Tyler"), who used to be a friend of Bayne's as well. Tyler looked at a story (a collection of pictures and/or videos) that Bayne had posted on the smartphone social media app Snapchat and saw one that included Emily. Cody asked Tyler to take a

screenshot of that picture and send it to him.[1] When another user takes a screenshot of the Snapchat app, the person who posted the photo or video receives a notice that that particular user has taken a screenshot of that photo or video.

[5] The following day, Bayne received notice that Tyler had taken a screenshot of his Snapchat photo. He was upset and sent a message to Tyler asking him why he had done so. He also asked Tyler if he had taken the screenshot at Cody's direction. The two exchanged messages for about one hour until Tyler stopped responding between 1:00 p.m. and 1:30 p.m.

[6] Later that evening, Tyler met Cody at a local bar in Lowell, Indiana, where Cody's girlfriend Nikki worked. Tyler showed Cody the messages he had exchanged with Bayne regarding the screenshot, and Cody laughed at Bayne's reaction. The two drank beer and whiskey, and although Tyler claimed that they remained "relatively sober," Tr. Vol. 2, p. 35, tests taken after Cody's death revealed that his blood alcohol concentration was 0.142. Tr. Vol. 1, p. 194.

[7] At some point later in the night, Cody took Tyler's phone and used it to send a provocative photo to Bayne via Snapchat. Specifically, the photo was of Emily, nude from the waist up. Cody had used the Snapchat app's photo editor to

---

[1] Items posted to Snapchat are not stored long-term, and the Snapchat app does not provide a direct way of saving photos or videos posted by someone else.

cover Emily's nipples with an emoji or avatar of a person "flipping off" the viewer with its middle finger. Tr. Vol. 2, p. 37. Bayne received this Snapchat photo at approximately 2:00 a.m. on the morning of July 15, 2017, while he and Emily were in bed. Bayne responded by sending a message calling Cody a "deadbeat dad," and stating that Cody's daughter could not look up to her father. *Id.* at 41, 221. This angered Cody, who told Bayne that he was coming over to his house to confront him. Bayne then told Emily that Cody was on his way over to "beat my ass" or "whoop my ass." *Id.* at 125, 221. Cody and Tyler then drove over to Bayne's house, an approximately five-minute trip.

[8] In the meantime, Bayne got dressed, retrieved a handgun from his garage, and went outside and sat on the tailgate of a pickup truck to wait for Cody to arrive. Bayne claimed that he thought he did not have enough time to call 911, but he did not ask Emily to call 911 either. Emily sat next to Bayne on the tailgate awaiting the arrival of Cody and Tyler.

[9] When Cody and Tyler arrived at Bayne's house, Cody immediately got out of the car and began to walk toward Bayne. Bayne taunted Cody by stating, "what's up, baby boy[?]" Tr. Vol. 2, p. 137. Cody responded that he was going to "whoop [Bayne's] ass." *Id.* Emily got up from the tailgate and tried to intervene. She told Cody to leave and punched him in the face. Cody pushed Emily out of his way and told Bayne, "you want to bring my kid into it, now it's different," and told Bayne that "we got to settle this." Tr. Vol. 2, p. 46. Bayne warned Cody that he had a gun, and raised his handgun toward Cody, saying "I'm not going to fight you, but I will shoot you[.]" Tr. Vol. 3, p. 21.

[10]  There was conflicting testimony as to what occurred next. Tyler testified that, as he tried to deal with Emily, he heard a gunshot. He testified that he saw no physical altercation between Bayne and Cody. Emily testified that she saw Cody grab Bayne's legs before Bayne shot him. And Bayne testified that Cody grabbed his legs, and when he felt his legs slipping out from beneath him, he raised his weapon and fired a "random shot." Tr. Vol. 2, p. 228.

[11]  After hearing the shot, Tyler saw that Cody was lying on the ground and went over to check on him. Cody told Tyler to call 911, and he did so. Cody died at the scene sometime shortly thereafter. After the shooting, Bayne and Emily went inside Bayne's home, where Bayne also called 911. During this call, Bayne told the 911 operator that his girlfriend's ex-boyfriend, Cody, had come to his home and started "pushing and hitting us." Ex. Vol., State's Ex. 54. Also during the call, when Emily stated, "you shot Cody," Bayne responded, "he's not going to f**king push you around or push me around." *Id.* When emergency responders arrived at the scene, Bayne was cooperative and showed them where the gun he had used was located.

[12]  Autopsy results indicated that the bullet entered Cody's upper left chest, traveling downward through his left lung, striking his fourth thoracic vertebra, and exiting from the right lower back. The case of Cody's death was exsanguination. Forensic testing of Cody's shirt indicated that the weapon was one to two feet away from Cody when the fatal shot was fired.

[13] On July 15, 2017, the State charged Bayne with murder. On November 2, 2017, the State amended the charging information to include an allegation of Level 2 felony voluntary manslaughter. The amended charging information also alleged the sentence enhancement of use of a firearm. A four-day jury trial commenced on January 16, 2018, at which Bayne claimed self-defense. At the conclusion of the trial, the jury found Bayne not guilty of murder, but guilty of voluntary manslaughter. Bayne subsequently admitted to the firearm sentencing enhancement.

[14] At the May 11, 2018 sentencing hearing, Bayne argued that the entirety of his sentence, including the sentence enhancement, could be suspended. Bayne requested that the trial court sentence him to a total of ten years, with one year of incarceration and nine suspended to probation. The State requested that the trial court sentence Bayne to twenty-two years on the voluntary manslaughter conviction, with seventeen and one-half years executed and the remainder suspended to probation, and a consecutive term of five years for the firearm enhancement.

[15] The trial court expressed its belief that the firearm enhancement was not suspendible, but also stated, "I don't think that it would be proper for me on a gun enhancement to suspend the sentence, to give probation." Sentencing Tr. p. 54–55. Ultimately, the trial court sentenced Bayne to fifteen years executed on the voluntary manslaughter conviction and to five years in community corrections on the firearm enhancement. Bayne now appeals.

# Sufficiency of the Evidence

[16] Bayne argues that the State presented insufficient evidence to support his conviction for voluntary manslaughter and to rebut his claim of self-defense. Our standard of review of claims of insufficient evidence is well settled:

> When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. We consider only the probative evidence supporting the verdict and any reasonable inferences which may be drawn from this evidence. We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.

*Harrison v. State*, 32 N.E.3d 240, 247 (Ind. Ct. App. 2015), *trans. denied* (citing *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)).

## I. *Voluntary Manslaughter*

[17] Bayne first argues that his conviction for voluntary manslaughter cannot stand because there was insufficient evidence of sudden heat. This argument calls for us to once again discuss the difference between murder and voluntary manslaughter.

[18] A person who knowingly or intentionally kills another human being commits murder. Ind. Code § 35-42-1-1(1). However, a person who knowingly or intentionally kills another human being while acting under "sudden heat" commits voluntary manslaughter. Ind. Code § 35-42-1-3(a). Since voluntary

manslaughter is simply murder mitigated by evidence of sudden heat, it is an inherently included offense of murder. *Watts v. State*, 885 N.E.2d 1228, 1231 (Ind. 2008); *Wilkins v. State*, 716 N.E.2d 955, 956–57 (Ind. 1999). "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018), *reh'g denied* (quoting *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015)). "Sudden heat excludes malice, and neither mere words nor anger, without more, provide sufficient provocation." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005). Evidence of sudden heat may be found in either the State's case-in-chief or the defendant's case. *Brantley*, 91 N.E.3d at 572 (citing *Jackson v. State*, 709 N.E.2d 326, 328 (Ind. 1999)). The question of whether the evidence presented constitutes sudden heat sufficient to warrant a conviction for voluntary manslaughter instead of murder is for the jury to determine. *Id*.

[19] Contrary to Bayne's claims that there was no evidence of sudden heat, Bayne himself testified that he was "terrified" when Cody threatened to beat him up, as he knew Cody had a reputation for violence and often carried a firearm. Tr. Vol. 2, p. 223, 225, 235. Bayne also testified that he suffered from a serious kidney condition and had to avoid trauma to his kidneys; thus, he was "terrified" of fighting Cody. *Id*. at 228. There was also evidence indicating that Bayne was provoked by anger, rage, or resentment: Cody sent Bayne a nude picture of Bayne's girlfriend, Emily, and threatened to come over and beat him

up. Even after the shooting, Bayne seemed angry, stating on the 911 call that Cody was "not going to f**king push [Emily] around or push me around." Ex. Vol., State's Ex. 54. Thus, there was ample evidence that Bayne was acting out of fear, anger, resentment, or a combination thereof.

[20] We find this case similar to *Brantley, supra*, where our supreme court disagreed with the contention that the State's concession that the defendant acted under sudden heat nullified the defendant's claim of self-defense. The court explained:

> [C]laims of self-defense and killing in sudden heat are not inherently inconsistent and, in appropriate circumstances, juries may be instructed on both. As with most cases, the jury here was faced with two stories: one where Brantley acted irrationally out of sudden heat, the other where Brantley acted rationally in self-defense. These explanations for Brantley's actions are not conflicting since the nature of each defense is different, and it was within the province of the jury to weigh the evidence and assess witness credibility in arriving at its verdict.
>
> **Indeed, common to both defenses is terror.** A defendant acts in self-defense when confronted with real danger of death or great bodily harm, or in such apparent danger as caused him, in good faith, to fear death or great bodily harm. The danger need not be actual, **but the belief must be in good faith and the reaction must be reasonable**. Similarly, sudden heat, which is sufficient to reduce murder to voluntary manslaughter, requires evidence of anger, rage, sudden resentment, or terror that is sufficient to obscure the reason of an ordinary man. **Thus, terror sufficient to establish the fear of death or great bodily harm necessary for self-defense could be equally sufficient to invoke sudden heat**. In other words, the same evidence can either mitigate murder or excuse it altogether. **It's the jury's call**. Here, faced with

competing evidence, the jury rejected Brantley's self-defense defense, a decision we affirm.

*Brantley*, 91 N.E.3d at 573–74 (emphases added) (citations and internal quotation marks omitted).

[21] The same is true in the present case. Common to both the State's claim of voluntary manslaughter and Bayne's claim of self-defense was Bayne's claim of fear and terror. Bayne presented evidence supporting his claim that he was in fear of Cody and that he acted rationally out of self-defense. The State presented evidence that Bayne was afraid of Cody and acted irrationally in sudden heat. As in *Brantley*, it was the jury's prerogative to decide whether Bayne acted rationally or irrationally under these circumstances. Unfortunately for Bayne, the jury decided that he acted irrationally. Although this is a close case, we are unable to say that no reasonable jury could conclude that Bayne acted out of sudden heat.

## II. Self-Defense

[22] The same reasoning dooms Bayne's argument that there was insufficient evidence to negate his claim of self-defense. Our standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency-of-the-evidence claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). "When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements." *Id.* at 800. "The State may meet this burden by

rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief." *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Wilson*, 770 N.E.2d at 800–01.

[23] A valid claim of self-defense is legal justification for an otherwise criminal act. *Wallace v. State*, 725 N.E.2d 837, 840 (Ind. 2000). Pursuant to Indiana Code § 35-41-3-2(c), "[a] person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." However, a person is justified in using deadly force, and does not have a duty to retreat, "if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." *Id*. To prevail on a self-defense claim, the defendant must show that he: (1) was in a place where he had a right to be; (2) acted without fault; and (3) was in reasonable fear of death or great bodily harm. *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003).

[24] Still, "the force used must be proportionate to the requirements of the situation." *Weedman v. State*, 21 N.E.3d 873, 892 (Ind. Ct. App. 2014) (citing *McKinney v. State*, 873 N.E.2d 630, 643 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. Thus, "a claim of self-defense will fail if the person 'uses more force than

is reasonably necessary under the circumstances.'" *Id*. (citing *Sudberry v. State*, 982 N.E.2d 475, 481 (Ind. Ct. App. 2013)).

[25] Here, the jury could reasonably conclude that, even though Bayne may have been "terrified" of Cody, he did not act in a reasonable manner and used more force than was necessary under the circumstances. When Cody threatened to come over and fight Bayne, Bayne did not stay inside his home and call 911. He instead armed himself, went outside, and waited for Cody to arrive. When Cody did arrive, Bayne taunted him and pointed a gun at him. And even though there was evidence that Cody did attempt to physically engage in a fight with Bayne by grabbing his legs, the jury could reasonable conclude that Bayne responded in a disproportionate manner by shooting Cody in the chest. There was no indication that Cody was armed in any way. And despite Bayne's claim that he feared serious injury due to his kidney problem, the jury was under no obligation to credit this testimony.

[26] Again, as in *Brantley*, it was for the jury, not this court on appeal, to determine whether Bayne acted rationally in self-defense or irrationally in sudden heat. The jury chose the latter, and we cannot say that no reasonable jury could come to this conclusion. Accordingly, we affirm Bayne's conviction for voluntary manslaughter.

## Sentencing

[27] Bayne also argues that we should remand for resentencing on the firearm enhancement because the trial court was under the assumption that any

sentence imposed on the enhancement could not be suspended. Bayne's argument presumes that the trial court was mistaken, i.e., that the firearms enhancement could be suspended.[2]

Pursuant to Ind. Code section 35-50-2-11(d):

> The state may seek, on a page separate from the rest of a charging instrument, to have a person who allegedly committed an offense sentenced to an additional fixed term of imprisonment if the state can show beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense.

If the State so alleges, the question of whether the defendant did knowingly or intentionally use a firearm in the commission of the offense is put before the jury in a manner similar to that of a habitual offender enhancement. *See id*. at § 11(f). If the jury finds that the State proved beyond a reasonable doubt that the defendant "knowingly or intentionally used a firearm in the commission of the offense under subsection (d), the court may sentence the person to an additional fixed term of imprisonment of between five (5) years and twenty (20) years." *Id*. at § 11(g).

In contrast to the habitual offender statute, however, the firearm enhancement statute does not state that a sentence imposed thereunder may not be

---

[2] Contrary to Bayne's argument on appeal, his trial counsel did not state that the firearm enhancement was non-suspendible. In fact, his trial counsel specifically argued to the trial court at the sentencing hearing that the firearm enhancement was suspendible. Sentencing Tr. p. 34–35.

suspended. *Compare* Ind. Code § 35-50-2-8(i) ("An additional term imposed under [the habitual offender statute] is nonsuspendible.") *with* I.C. § 35-50-2-11 (containing no similar provision). It therefore appears that Bayne is correct that a firearm enhancement may be suspended. To the extent that the trial court believed otherwise, it was mistaken.

[30] However, we do not believe that remand for resentencing is necessary. As noted by the State, even though the trial court indicated its belief that a firearm enhancement could not be suspended, it also stated that it did not believe that a suspended sentence was appropriate in the present case. Specifically, the trial court stated, "So to the extent that the argument is made that I should give Mr. Bayne a suspended probation term for that five-year term, I do not believe that's appropriate." Sentencing Tr. p. 55. We therefore agree with the State that there is no need to remand for resentencing on the firearm enhancement because we are confident that the trial court would have imposed the same sentence even if it believed that the enhancement was suspendible. *See Grimes v. State*, 84 N.E.3d 635, 644 (Ind. Ct. App. 2017) (noting that, even if the trial court abuses its discretion by considering an improper aggravator, we will not remand for resentencing if we are confident that the trial court would have impose the same sentence regardless of the error), *trans. denied*.

## Conclusion

[31] The State presented evidence sufficient to support Bayne's conviction for voluntary manslaughter and to negate his claim of self-defense. There was

evidence that Bayne was angry, terrified, and resentful of the victim, and the decision as to whether Bayne acted rationally in self-defense or irrationally in sudden heat was a question for the jury that we will not disturb on appeal. With regard to Bayne's sentence, even if the trial court erroneously believed that the firearm enhancement was non-suspendible, we need not remand for resentencing, as the trial court indicated that it would have imposed the same sentence even if it believed that the enhancement was suspendible. We therefore affirm the judgement of the trial court.

[32] Affirmed.

Vaidik, C.J., and Crone, J., concur.