## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 17 2015, 9:42 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE

Chad McKinney
Michigan City, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Chad McKinney,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

April 17, 2015

Court of Appeals Case No.
49A04-1406-PC-282

Appeal from the Marion Superior Court
The Honorable Clark H. Rogers, Judge
Trial Court Cause No. 49F25-0312-PC-222387

**Bradford, Judge.**

# Case Summary

[1]     In 2006, Appellant-Petitioner Chad McKinney was convicted of the murder of Anthony Laurenzo.  His conviction was affirmed on direct appeal.  McKinney

subsequently filed a petition for post-conviction relief ("PCR"), in which he alleged that he had received ineffective assistance of both trial and appellate counsel. Following an evidentiary hearing, the post-conviction court denied McKinney's petition. McKinney appealed this determination.

[2] On appeal, McKinney again alleges that he received ineffective assistance of both trial and appellate counsel. McKinney also alleges that he received ineffective assistance of post-conviction counsel. Concluding that McKinney has failed to establish that he received ineffective assistance of trial, appellate, or post-conviction counsel, we affirm.

# Facts and Procedural History

[3] Our opinion in McKinney's prior direct appeal, which was handed down on September 17, 2007, instructs us as to the underlying facts and procedural history leading to this post-conviction appeal:

> On the night of December 19, 2003, Dominick Bruno ("Dominick") and [Laurenzo], who had been a groomsman in Dominick's wedding, procured some LSD and then went to Dancer's Show Club in Indianapolis. Both men consumed some of the LSD before entering the club. After a few minutes, Laurenzo began acting abnormally, alternating between periods of quiet with his head between his knees and periods where he had a great deal of energy, was shaking, and was yelling, "Oh, Jesus." Tr. p. 222. The club's doorman saw Laurenzo crying and rubbing his chest and believed that Laurenzo was hallucinating. Eventually, the doorman asked Dominick to take Laurenzo out of the club.

About that time, Dominick received a call from his wife, Connie. Connie, who was eight-and-a-half months pregnant, was at the couple's trailer home with their young son, Joseph. Connie told Dominick that McKinney, who had also been a groomsman in Dominick's wedding, was at the home and needed to see him. According to Connie, McKinney had been drinking whiskey and seemed sad. Dominick and Laurenzo left the club and drove to the Brunos' home. During the drive, Laurenzo was swinging his arms and talking with God and Jesus. Twice during the drive, Dominick pulled over to calm Laurenzo.

After they arrived at Dominick's home, Dominick led Laurenzo inside. McKinney was lying on the floor near the door, and Laurenzo stepped on him. Laurenzo was still swinging his arms, and he hit McKinney. McKinney pulled Laurenzo onto a couch and started hitting him before Dominick and Connie separated them. Dominick told McKinney that Laurenzo was "on a bad trip" from the LSD, that he was "not trying to hurt nobody," and that McKinney should leave him alone. *Id*. at 230. At that point, Laurenzo was foaming at the mouth and claiming that he was God and "the most powerful man in the world." *Id*. at 77-78. Connie tried to give Laurenzo a glass of milk, but Laurenzo threw it or knocked it out of her hand. Dominick left the room to check on Joseph and returned to find McKinney beating Laurenzo up again, and Dominick again separated the two.

McKinney eventually left the trailer, but he returned approximately ten minutes later with a purple Crown Royal bag and a white glove. By that point, Laurenzo had "actually started to listen" to Dominick "a little bit." *Id*. at 232. Nonetheless, McKinney removed a small pistol from the purple bag and pointed it at Laurenzo. McKinney then fired a shot while the gun was pointed at the ground. Dominick told McKinney, "Look, you just shot a bullet. You need to go. I got a son here, I've got a pregnant wife. You know this is not good. You need to leave now." *Id*. at 236-37. McKinney placed the gun on an entertainment center but did not leave. Laurenzo was still standing and claiming to be God and the most powerful man in the world. Connie told Laurenzo to sit down, and Laurenzo approached her "like he was going to hit [her] or something." *Id*. at 88. Connie told

Laurenzo, "I'm pregnant and you're not going to hit me," and Laurenzo did not do anything to her. *Id.*

Connie then called 911 to get help for Laurenzo. While she was on the phone, McKinney approached Laurenzo, put him in a headlock, pushed the gun against his temple, and shot him in the head. Laurenzo immediately fell to the floor. Dominick saw McKinney drop the gun, and McKinney left the trailer. Laurenzo died of "a through-and-through contact gunshot wound to the head." *Id.* at 322. Dominick and Connie gave statements to the police and identified McKinney as the shooter. Police found a gun broken into several pieces on the floor of the trailer.

After McKinney was arrested, he reported to a doctor at the Marion County Jail that he had a bullet lodged in his hand. He subsequently removed the bullet himself using a razor blade and gave it to a guard. Testing showed that the bullet had been fired from the gun recovered by police. Furthermore, McKinney's wound was consistent with the exit wound on Laurenzo's head because the exit wound indicated that something was resting against Laurenzo's skin, possibly McKinney's hand. Finally, DNA testing showed that Laurenzo's blood was on the barrel of the recovered gun and on McKinney's jacket.

The [Appellee-Respondent the State of Indiana (the "State")] charged McKinney with murder, a felony. A jury trial was held on August 15-17, 2005. During the noon recess on August 15, Judge Patricia Gifford ("Judge Gifford") became aware that Laurenzo's mother had worked for her in the early 1980s. Judge Gifford brought counsel into her chambers and advised them of her former relationship with Laurenzo's mother. McKinney's attorney indicated that she had known this information from the beginning and had not asked for recusal because she felt that Judge Gifford is fair.

During the trial, Connie testified that she heard a "pop" then looked over and saw Laurenzo falling. Ex. p. 304. The prosecutor asked Connie whether she saw a gun at that point, and she said "no." *Id.* at 305. Regarding Dominick's testimony that McKinney dropped the

gun to the floor after shooting Laurenzo and the fact that the gun was found in several pieces on the floor, David Brundage ("Brundage"), the State's firearms expert, was asked whether dropping the weapon would cause it to fall apart. He responded:

> Not in my opinion. One, the magazine has to be out of the gun. Two, the safety has to be forward or to a firing position, then the slide has to be drawn all the way back before it can be lifted up and in my opinion that couldn't be done with—in a dropping situation. Has to be—that would have to be done on purpose.

*Id*. at 614-15. On August 17, 2005, the last day of the trial, the jury was unable to reach a verdict, and the trial court declared a mistrial and scheduled another pre-trial conference.

Two days later, McKinney's attorney filed a motion asking Judge Gifford to grant a change of judge pursuant to Indiana Rule of Criminal Procedure 12(B) ("Criminal Rule 12(B)") based upon Judge Gifford's former relationship with Laurenzo's mother. Judge Gifford denied the motion, finding that McKinney had failed to file it within ten days of his plea of not guilty as required by Indiana Rule of Criminal Procedure 12(D) ("Criminal Rule 12(D)") and that "[n]o facts have been alleged that would cause an objective person to have a reasonable basis for doubting the judge's impartiality [.]" Appellant's Supp. App. p. 3.

The second jury trial commenced on April 24, 2006. When the prosecutor asked Connie whether she saw a gun after hearing a gunshot, she testified, in contrast to her testimony at the first trial, "When [McKinney] turned around—when he turned around he had his hands—he opened his hands like this and he said, 'What do you want me to do?' And the gun fell and hit the floor." Tr. p. 91. On cross-examination, McKinney's counsel asked Connie whether her testimony "differs radically" from her testimony during the first trial, and Connie responded, "Yes." *Id*. at 140. This exchange led to the following question from the jury: "[I]f your testimony is different today than it was previously, why did you change it?" *Id*. at 142. Connie answered, "Because I was assured that no matter what happened, me and my children were going to be safe." *Id*.

McKinney's counsel immediately moved for a mistrial, arguing that Connie's response to the jury's question implied that McKinney is dangerous and had threatened her. The trial court denied the motion. Later in the trial, the defense called Connie as a witness and asked her whether McKinney had ever threatened her, and she said, "No." *Id*. at 583.

Dominick also gave new testimony at the second trial. Specifically, he testified that before McKinney shot Laurenzo, McKinney had said, referring to Laurenzo, "We don't need him anymore" and that McKinney had put the gun in Laurenzo's mouth and said, "Do you want me to blow your head off, m* * * * * f* * * * *?" *Id*. at 234.

Brundage again served as the State's firearms expert during the second trial. During the course of the testimony, he disassembled the gun and realized, contrary to his testimony at the first trial, that it could be disassembled without the magazine having been removed. When asked again whether dropping the gun would cause it to break into pieces, he responded, contrary to his testimony at the first trial, "Not normally, but in my business anything can happen, and I would never want to be totally conclusive that it could never happen." *Id*. at 544. When asked whether he was changing his testimony, Brundage replied, "I would have to change that at this time to reflect that the magazine does not have to be in the gun, or out of the gun." *Id*. at 545. The prosecution did not notify the defense of any of these changes in testimony.

McKinney tendered lesser included offense instructions for the crimes of reckless homicide and criminal recklessness. The trial court refused to give the instructions, concluding that the evidence would not support convictions for these offenses. The jury found McKinney guilty of murder. Judge Gifford made the following statement at the sentencing hearing:

> I think it's unlikely to believe that the victim facilitated this crime by his actions since it was very much in evidence that he was not in control of his actions, that [McKinney] acted under a strong provocation. The

evidence did show that he did go out and get the gun and return after a period of time. That circumstances are not likely to happen again. These circumstances aren't, but I'm not sure that another set might not. I would agree that in fact it might be a hardship to his children, however, I've not really seen any evidence that he was financially supporting the children. I'm not sure that they need his other support. There was one mitigator, the fact that his criminal history is minimal, at best. However, taking into consideration the evidence presented to the jury in which they found [McKinney] knowingly killed the victim in this matter, would override any mitigation[.]

Tr. p. 624-25. Judge Gifford sentenced McKinney to a prison term of fifty-five years, the presumptive sentence for murder.

*McKinney v. State*, 873 N.E.2d 630, 635-38 (Ind. Ct. App. 2007).

[4] On July 7, 2008, McKinney filed a *pro se* PCR petition. An attorney for the Office of the Public Defender of Indiana entered an appearance on August 28, 2008, but subsequently withdrew his appearance on February 23, 2010. On September 30, 2010, McKinney filed a motion to withdraw his petition, without prejudice. The post-conviction court granted McKinney's September 30, 2010 motion to dismiss on October 4, 2010.

[5] On January 23, 2012, McKinney filed a second pro se PCR petition. The post-conviction court conducted a bifurcated evidentiary hearing on September 12, 2013 and January 23, 2014. On May 22, 2014, the post-conviction court issued an order denying McKinney's request for PCR.

# Discussion and Decision

[6] Post-conviction procedures do not afford the petitioner with a super-appeal. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999). Instead, they create a narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Id.* A petitioner who has been denied post-conviction relief appeals from a negative judgment and as a result, faces a rigorous standard of review on appeal. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001); *Colliar v. State*, 715 N.E.2d 940, 942 (Ind. Ct. App. 1999), *trans. denied*.

[7] Post-conviction proceedings are civil in nature. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Therefore, in order to prevail, a petitioner must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Stevens*, 770 N.E.2d at 745. When appealing from the denial of a PCR petition, a petitioner must convince this court that the evidence, taken as a whole, "leads unmistakably to a conclusion opposite that reached by the post-conviction court." *Stevens*, 770 N.E.2d at 745. "It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law." *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We therefore accept the post-conviction court's findings of fact unless they are clearly erroneous but give no deference to its conclusions of law. *Id.*

McKinney claims that the post-conviction court erred in denying his PCR petition because the evidence demonstrates that he received ineffective assistance of both trial and appellate counsel. McKinney also claims that he received ineffective assistance of his PCR counsel. We will discuss each claim in turn.

## Ineffective Assistance of Counsel

The right to effective counsel is rooted in the Sixth Amendment to the United States Constitution. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006). "'The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

A successful claim for ineffective assistance of counsel must satisfy two components. *Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007). Under the first prong, the petitioner must establish that counsel's performance was deficient by demonstrating that counsel's representation "fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* We recognize that even the finest, most experienced criminal defense attorneys may not agree on

the ideal strategy or most effective way to represent a client, and therefore, under this prong, we will assume that counsel performed adequately and defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002). Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id*.

Under the second prong, the petitioner must show that the deficient performance resulted in prejudice. *Reed*, 866 N.E.2d at 769. Again, a petitioner may show prejudice by demonstrating that there is "a reasonable probability (*i.e.* a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id*. A petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail. *See Williams*, 706 N.E.2d at 154. Stated differently, "[a]lthough the two parts of the *Strickland* test are separate inquires, a claim may be disposed of on either prong." *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (citing *Williams*, 706 N.E.2d at 154).

## A. Ineffective Assistance of Trial Counsel

McKinney argues that his trial counsel provided ineffective assistance in numerous regards, including (1) failing to call McKinney to testify during trial, (2) requesting that the trial court's instructions to the jury include a self-defense jury instruction, (3) failing to call firearm and pathology experts to contest the testimony of the State's expert witnesses, (4) failing to make a timely request for a change of judge, and (5) failing to present mitigating evidence at sentencing.

### 1. Failing to Call McKinney to Testify During Trial

[13]   McKinney asserts that his trial counsel provided ineffective assistance by failing to call him as a witness during trial. Specifically, McKinney states that counsel should have allowed him to present a claim that he acted in self-defense and that the gun accidentally fired. McKinney claims that he told his counsel that he wished to testify, but that his counsel would not let him. However, contrary to McKinney's claim that he wished to testify at trial, McKinney's trial counsel testified at the PCR evidentiary hearing that McKinney "expressed to me [that] he absolutely did not want to testify" as "there was some issue regarding … the bullet that was lodged in his hand which he had removed at the jail. And also he … he was very concerned that it might not be helpful to him." PCR Tr. pp. 23-24 (ellipses in original). Further, even if McKinney would have expressed a desire to testify, trial counsel further testified that she "would have advised against it and I probably did." PCR Tr. p. 24.

[14]   In addition, trial counsel testified that it was the defense's proffered theory that McKinney "was not the shooter. That the shooter in fact was Dominic[k] Bruno." Tr. p. 24. Allowing McKinney to provide an alternative theory that he acted in self-defense would have been in direct contrast to the proffered defense. Trial counsel made the tactical decision to present the theory that Dominick, not McKinney, was the shooter. Trial counsel presented evidence and argument during trial to support this theory. Specifically, trial counsel presented evidence which established the following:

Dominic[k] Bruno, he was bi-polar and off his medication. I was able to establish he was off his medication. He'd had a history of erratic (inaudible) and sometimes violent behavior when he was not medicated. (Phone static) And we both (phone static) I believe it was established that the gun was allegedly dropped by Mr. McKinney or this is what I think the Bruno's testified and that it shattered into pieces. Yet the gun was intact and had been reassembled and so our ... our strategy was to try and get the jury to believe or at least to make a reasonable doubt that Mr. ... that Bruno had shot the gun and had reassembled it, and handled it, before the police arrived. And that both of the Bruno's [sic] had a motive emphatically because of not wanting Dominic[k] to go to prison and they would have a murder.

PCR Tr. pp. 24-25. Again, we defer to counsel's strategic and tactical decisions. *Smith*, 765 N.E.2d at 585. Because the PCR record demonstrates that trial counsel presented a plausible theory on defense which, if successful, would have resulted in an acquittal, we conclude that the post-conviction court did not err in determining that trial counsel did not provide ineffective assistance in this regard.

## 2. Requesting a Self-Defense Jury Instruction

[15] McKinney also asserts that his trial counsel provided ineffective assistance by requesting a self-defense jury instruction. McKinney, however, did not raise this issue in his January 23, 2012 PCR petition.[1] As such, this claim is unavailable here because "[i]ssues not raised in the petition for post-conviction

---

[1] McKinney's PCR petition included a claim that his trial counsel was ineffective for failing to call him as a witness during trial and for attempting to provide jury instructions on the lesser-included offenses of reckless homicide. It did not, however, include a claim that trial counsel provided ineffective assistance by requesting a self-defense jury instruction.

relief may not be raised for the first time on post-conviction appeal." *Allen v. State*, 749 N.E.2d 1158, 1171 (Ind. 2001) (citing Ind. Post-Conviction Rule 1(8) which provides that "[a]ll grounds for relief available to a petitioner under this rule must be raised in his original petition.")

### 3. Failing to Call Firearms and Pathology Experts to Contest the Testimony of the State's Expert Witnesses

McKinney asserts that his trial counsel provided ineffective assistance by failing to call a firearm and a pathology expert to contest the testimony of the State's expert witnesses. McKinney, however, did not raise these issues in his January 23, 2012 PCR petition. Again, these claims are unavailable here because "[i]ssues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal." *Allen*, 749 N.E.2d at 1171.

Further, even if McKinney had preserved these issues, he did not provide any evidence, be that affidavits or sworn testimony, from potential witnesses indicating what their testimony would have been. Without this evidence, McKinney cannot establish a claim of ineffective assistance or prejudice because we have no way to judge trial counsel's performance in this regard. *See Hunter v. State*, 578 N.E.2d 353, 355 (Ind. 1991) (providing that the court could not say that counsel's performance was ineffective because it had no idea what the potential witnesses would have testified about and, as a result, have no basis to judge counsel's performance).

#### *4. Failing to Make a Timely Request for a Change of Judge*

[18]   McKinney further asserts that his trial counsel provided ineffective assistance by failing to file a timely motion for a change of judge. McKinney claims that trial counsel was ineffective in this regard because Judge Gifford was biased or prejudiced against him because Laurenzo's mother was a former employee of Judge Gifford.

[19]   As we recognized in McKinney's direct appeal, trial counsel initially made the tactical decision not to request a change of judge because of her belief that a change of judge was unnecessary "because Judge Gifford is fair," *McKinney*, 873 N.E.2d at 639, and because she had a good relationship with Judge Gifford. Trial counsel also indicated that when she did ultimately file a motion for a change of judge, she "could not point to any specific instances of bias." PCR Tr. p. 27. Trial counsel went on to state,

> In other words, in my experience and I had been an attorney, you know, for I think at [that] time around fifteen, eighteen years, and did, you know, hundreds and hundreds of cases and in that time handled hundreds and hundreds of cases and I could not prove that she was treating me or [McKinney] any different than she'd treat any other defense counsel or defendant. I couldn't point to anything in particular. And then as I conducted further research into that I learned that … she had in fact fired this employee certainly or well before this shooting occurred and didn't, to quote, unquote "could not stand her". Now I don't know whether that's true because I never discussed that with Judge Gifford and I think she couldn't discuss her employee issues with me. But it's my understanding they didn't have a very good relationship to begin with.

PCR Tr. p. 27. Trial counsel did eventually file a motion for a change of judge, which was denied by the trial court. In discussing the filing and denial of the motion during the PCR evidentiary hearing, trial counsel further stated the following:

> It's my recollection that I did file a motion for change of judge.… I didn't feel that I had not timely filed it. I think I filed within a certain time asking that (inaudible) and make sure that it was factually accurate and try and justify filing the motion, which I did. And [I] should also state again there that I had indicated I did not see bias. Which probably was true because I did not in fact see bias from the Bench.

PCR Tr. pp. 27-29 (brackets added).

[20] Upon reviewing the trial court's denial of the motion for a change of judge that was ultimately filed by McKinney's trial counsel, we concluded on appeal that "even if McKinney's motion had been timely filed, [McKinney] failed to make a showing of bias or prejudice." *McKinney*, 873 N.E.2d at 640. In reaching this conclusion, we stated the following: "McKinney argues that '[t]he personal relationship between the judge and her former employee support a rational inference of bias and prejudice.'" Appellant's Br. p. 8. However, approximately twenty years had passed since Laurenzo's mother had worked with Judge Gifford, and McKinney's affidavit did not allege any facts suggesting that any relationship existed between the two after that employment was terminated." *Id*.

The record demonstrates that trial counsel initially made the tactical decision to refrain from filing a motion for a change of judge. Again, we defer to counsel's strategic and tactical decisions. *Smith*, 765 N.E.2d at 585. Furthermore, even if counsel could possibly be found to have provided deficient performance by failing to file the motion for a change of judge sooner, McKinney has failed to prove that he was prejudiced by trial counsel's decision in this regard. The record is devoid of any evidence which would suggest that the trial court acted with bias toward McKinney or that the eventual outcome of his trial would have been any different had a timely motion for a change of judge been granted. Likewise, the record is devoid of any evidence which would suggest that the length of the sentence imposed following the jury's finding of guilt would have been any different had a timely motion for a change of judge been granted. As such, McKinney's claim in this regard must fail because he has failed to prove both deficient performance and prejudice. *See Williams*, 706 N.E.2d at 154 (providing that a petitioner's failure to satisfy either prong will cause the ineffective assistance of counsel claim to fail).

### 5. *Failing to Present Mitigating Evidence at Sentencing*

McKinney also asserts that his trial counsel provided ineffective assistance for failing to present mitigating evidence at sentencing. Specifically, McKinney claims that his trial counsel failed to present the following mitigating evidence: (a) the circumstances of the crime, including that McKinney claimed to have been provoked; (b) circumstances of the crime unlikely to reoccur; and (c) McKinney's children would be unduly burdened by his incarceration.

## a. Circumstances of the Crime

[23] McKinney claims that, given the opportunity to testify to the circumstances of the crime, he could have convinced the trial court that he was provoked and committed "at most a Reckless Homicide." Appellant's Br. p. 31. We disagree and conclude that McKinney's claim must fail because he has failed to prove that he was prejudiced, *i.e.*, that the outcome of the sentencing hearing would have been different if trial counsel had presented McKinney's desired evidence.

[24] The evidence presented at trial was that of an execution-style killing. In finding McKinney guilty of murder, the jury found that the evidence showed that McKinney knowingly or intentionally killed Laurenzo. In considering whether McKinney suffered any potential prejudice due to the exclusion of McKinney's desired evidence, we refer back to our prior decision on direct appeal in which we stated that:

> It is undisputed that Laurenzo was incapacitated and acting out. However, Dominick told McKinney multiple times that Laurenzo did not intend to hurt anybody and that he was only having a negative reaction to the drugs in his system. In addition, McKinney had several opportunities to remove himself from the situation. At one point he did leave, only to return with the gun and shoot Laurenzo. To the extent that McKinney was provoked by Laurenzo, we noted above that the jury could have reasonably concluded that the deadly force used by McKinney was not proportionate to the requirements of the situation.

*McKinney*, 873 N.E.2d at 645-46 (citation omitted). We also note that McKinney has failed to present any additional evidence during the PCR proceedings that would indicate that he was prejudiced by counsel's failure to

present McKinney's additional desired evidence. As such, McKinney has failed to establish that he was prejudiced by his trial counsel's failure to present his desired evidence during the sentencing hearing.

### b. Circumstances Unlikely to Reoccur

McKinney claims that his trial counsel failed to present evidence supporting the alleged mitigating factor that the circumstances of the crime were unlikely to reoccur. Despite McKinney's claim in this regard, however, the record demonstrates that this alleged mitigating factor was presented to and explicitly rejected by the trial court. As such, trial counsel cannot be found ineffective for failing to raise this allegedly mitigating factor at sentencing.

### c. Undue Burden by McKinney's Incarceration

McKinney also claims that his trial counsel was ineffective for failing to call the mother of his children to testify at sentencing to the undue burden that would be placed upon the children if McKinney were sent to prison. The record demonstrates that McKinney's trial counsel made the tactical decision not to call the mother of McKinney's children to testify at sentencing. In explaining this tactical decision during the PCR evidentiary hearing, trial counsel stated that:

> The issue with regards to having the mother of the children testify was that she was a very hostile witness at the time. She (inaudible) I had a … interviewed her extensively. She had indicated to me that if she were called to testify she would be harmful to Mr. McKinney and would not say anything in his favor. In fact stated that she would like to see him go to prison. And she [was] very angry with him at the time. I'm not sure what all the details were of that. But I also recall

> my notes which indicated that I met with Mr. McKinney and discussed this with him and he thought it would not be a good idea to put her on as a witness given … given her hostility.

PCR Tr. pp. 22-23.  Again, we defer to counsel's strategic and tactical decisions.  *Smith*, 765 N.E.2d at 585.

Furthermore, review of the record demonstrates that McKinney has failed to prove that he was prejudiced by his trial counsel's strategic decision.  In considering whether McKinney was prejudiced by the lack of his children's mother's testimony at sentencing, we previously stated that:

> McKinney fails to explain how the minimum sentence of forty-five years would cause any less hardship on his children than the fifty-five-year presumptive sentence actually imposed.  Indeed, the difference between those two sentences "hardly can be argued to impose much, if any, additional hardship" on McKinney's children.

*McKinney*, 873 N.E.2d at 645 (citation omitted).  In addition, McKinney has provided no evidence suggesting that the trial court would have imposed a different sentence if trial counsel would have presented his allegedly desired evidence during sentencing.

## B.  Ineffective Assistance of Appellate Counsel

The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel in that the petitioner must show appellate counsel was deficient in her performance and that the deficiency resulted in prejudice.  *Overstreet v. State*, 877 N.E.2d 144, 165 (Ind. 2007) (citing *Bieghler v. State*, 690 N.E.2d 188, 193 (Ind. 1997)). Again, to satisfy the first prong, the

petitioner must show that counsel's performance was deficient in that counsel's representation fell below an objective standard of reasonableness and that counsel committed errors so serious that petitioner did not have the "counsel" guaranteed by the Sixth Amendment. *Id*. (citing *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002)). To show prejudice, the petitioner must show a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Id*. (citing *McCary*, 761 N.E.2d at 392). "When raised on collateral review, ineffective assistance claims generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well." *Id*. (citing *McCary*, 761 N.E.2d at 193-95).

[29] In alleging ineffective assistance of appellate counsel, McKinney asserts that his counsel rendered ineffective assistance by failing "to raise the threat issue on direct appeal." Appellant's Br. p. 37 (emphasis removed). McKinney framed this issue in his PCR petition as whether his appellate counsel had provided ineffective assistance for "failing to appeal the Court's denial of [his] motion for a mistrial after [the] State's witness testified and implied through her testimony that the Petition had threatened her." PCR App. p. 399. However, review of the record demonstrates that appellate counsel did raise this issue on direct appeal. *See McKinney*, 873 N.E.2d at 640-41 (providing that the trial court did not abuse its discretion in denying McKinney's motion for a mistrial that related to the so-called threat issue because defense counsel elicited a clarification from the witness that McKinney had not threatened her and that

any error was harmless in light of the overwhelming evidence of McKinney's guilt).

[30]    As a general rule, when a reviewing court decides an issue on direct appeal, the doctrine of *res judicata* applies, thereby precluding its review in post-conviction proceedings. *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000). The doctrine of *res judicata* prevents the repetitious litigation of that which is essentially the same dispute. *Sweeney v. State*, 704 N.E.2d 86, 94 (Ind. 1998). And, a petitioner for post-conviction relief cannot escape the effect of claim preclusion merely by using different language to phrase an issue and define an alleged error. *State v. Holmes*, 728 N.E.2d 164, 168 (Ind. 2000). "[W]here an issue, *although differently designated*, was previously considered and determined upon a criminal defendant's direct appeal, the State may defend against defendant's post-conviction relief petition on grounds of prior adjudication or *res judicata*." *Cambridge v. State*, 468 N.E.2d 1047, 1049 (Ind. 1984) (emphasis in original).

*Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006).

[31] Because appellate counsel raised the "threat" issue on direct appeal, counsel cannot be said to have provided inefficient assistance for failing to do so. Further, to the extent that McKinney attempts to frame the issue in a different light by arguing in his PCR brief that appellate counsel was ineffective for failing to argue that the alleged "threat" issue constituted a so-called "evidentiary harpoon" on direct appeal, McKinney cannot escape the effect of *res judicata* by merely using different language to phrase the issue. *See id*. The post-conviction court, therefore, did not err in finding that McKinney did not suffer from ineffective assistance of appellate counsel.

# C. Ineffective Assistance of Post-Conviction Counsel

[32] McKinney last contends that his post-conviction counsel provided ineffective assistance by failing to present certain evidence during the evidentiary hearing. We note that the right to counsel in post-conviction proceedings is not guaranteed by either the Sixth Amendment of the United States Constitution or Article I, Section 13 of the Indiana Constitution. *Daniels v. State*, 741 N.E.2d 1177, 1190 (Ind. 2001) (citing *Baum v. State*, 533 N.E.2d 1200, 1201 (Ind. 1989)).

> A petition for post-conviction relief is not generally regarded as a criminal proceeding and does not call for a public trial within the meaning of these constitutional provisions. *Carman v. State* (1935), 208 Ind. 297, 196 N.E. 78. It thus is not required that the constitutional standards be employed when judging the performance of counsel when prosecuting a post-conviction petition at the trial level or at the appellate level.
>
> We therefore apply a lesser standard responsive more to the due course of law or due process of law principles which are at the heart of the civil post-conviction remedy. We adopt the standard that if counsel in fact appeared and represented the petitioner in a procedurally fair setting which resulted in a judgment of the court, it is not necessary to judge his performance by the rigorous standard set forth in [*Strickland*].

*Baum*, 533 N.E.2d at 1201 (footnote omitted). In fact, review of relevant authority indicates that only a finding that counsel abandoned his client justifies a finding of ineffective assistance by post-conviction counsel. *See Waters v. State*, 574 N.E.2d 911, 912 (Ind. 1991) (providing that although petitioner's post-conviction counsel entered an appearance, counsel, in essence, abandoned his client and did not present any evidence in support of his client's claim); *Taylor v.*

*State*, 882 N.E.2d 777, 784 (Ind. Ct. App. 2008) (providing that the petitioner's post-conviction counsel provided ineffective assistance by effectively abandoning his client and did not present any evidence in support of his client's claim).

[33] McKinney does not allege that he was abandoned by his post-conviction counsel. McKinney merely alleges that his post-conviction counsel should have presented additional evidence during the evidentiary hearing on McKinney's PCR petition. Specifically, McKinney argues that his post-conviction counsel should have presented the testimony of an expert on the disease of Lupus, a pathology expert, and a firearms expert. However, despite McKinney's assertion that his post-conviction counsel should have provided additional evidence during the evidentiary hearing, the record demonstrates that McKinney was afforded a procedurally-fair setting in which post-conviction counsel presented argument and evidence in support of McKinney's claims. Because McKinney's post-conviction counsel appeared and represented McKinney in a procedurally-fair setting, we need not judge counsel's performance by the rigorous standard set forth in *Strickland*. *See Baum*, 533 N.E.2d at 1201.

# Conclusion

[34] In sum, we conclude that McKinney did not receive ineffective assistance from his trial, appellate, or post-conviction counsel. Accordingly, we affirm the post-conviction court's denial of McKinney's PCR petition.

[35] The judgment of the post-conviction court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.