

FILED

Oct 24 2023, 10:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jimmy Gurulé
Kevin Murphy
Exoneration Justice Clinic
Notre Dame Law School
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Reginald Dillard,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent.*

October 24, 2023

Court of Appeals Case No.
23A-PC-261

Appeal from the Elkhart Superior
Court

The Honorable Teresa L. Cataldo,
Judge

Trial Court Cause No.
20D03-2207-PC-19

**Opinion by Judge Pyle**

Judges Crone and Bradford concur.

**Pyle, Judge.**

## Statement of the Case

In January 2000, a jury convicted Reginald Dillard ("Dillard") of the August 1998 murder of Christopher Thomas ("Thomas"), and the trial court sentenced Dillard to sixty-five years in the Department of Correction. In October 2001, the Indiana Supreme Court affirmed Dillard's conviction on direct appeal. *See Dillard v. State*, 755 N.E.2d 1085 (Ind. 2001). In July 2022, Dillard, represented by attorneys Jimmy Gurulé ("Attorney Gurulé") and Elliot Slosar ("Attorney Slosar") filed a petition for post-conviction relief.[1] Also, in July 2022, Dillard filed a motion for a change of judge pursuant to Post-Conviction Rule 1(4)(b).[2] The post-conviction court denied Dillard's change of judge motion, and this interlocutory appeal concerns only the post-conviction court's denial of that motion.[3] Dillard specifically argues that the post-conviction court clearly erred when it denied his motion for a change of judge. Concluding that the post-

---

[1] At the outset, in full transparency, we note that on November 16, 2022, Attorney Gurulé, who is affiliated with Notre Dame Law School's Exoneration Justice Clinic ("the Clinic"), gave a presentation to several judges on this Court. During this presentation, Attorney Gurulé spoke about the Clinic. He also spoke about one of the Clinic's cases, *Royer v. State*, 166 N.E.3d 380 (Ind. Ct. App. 2021). In *Royer*, this Court affirmed the post-conviction court's order that granted Royer's successive petition for post-conviction relief based on newly discovered evidence and *Brady* violations and vacated Royer's murder conviction. *Id*. at 405. In Dillard's appellate brief, Attorney Gurulé cites *Royer* in support of his argument that the post-conviction court erred in denying Dillard's motion for a change of judge. We note that none of the judges on this panel of Dillard's appeal attended Attorney Gurulé's presentation or discussed the *Royer* case with any of the judges who attended the presentation.

[2] Although Dillard's motion was titled a motion for recusal, we note that Post-Conviction Rule 1(4)(b) does not include the term recusal. Rather, Post-Conviction Rule 1(4)(b) uses the terms change of judge. We will, therefore, refer to Dillard's motion as a motion for a change of judge.

[3] We express no opinion on the merits of Dillard's post-conviction relief petition, which is pending before the post-conviction court.

conviction court did not clearly err, we affirm the post-conviction court's denial of Dillard's change of judge motion.[4]

[2] We affirm.

## Issue

Whether the post-conviction court clearly erred when it denied Dillard's motion for a change of judge.

## Facts

[3] In July 2022, Dillard, represented by Attorney Gurulé, filed a 273-page petition for post-conviction relief. In his petition, Dillard argued as follows:

An epidemic exists in Elkhart, Indiana where wrongful convictions are a predictable product of police misconduct,

---

[4] We note that Attorney Gurulé is also representing Leon Tyson ("Tyson"), Pink Robinson ("Robinson"), and Iris Seabolt ("Seabolt"), three other petitioners who appealed the post-conviction court's denial of their change of judge motions. Tyson's appeal was originally filed under Cause Number 22A-PC-143, Robinson's appeal was originally filed under Cause Number 22A-PC-1102, and Seabolt's appeal was originally filed under Cause Number 22A-PC-208. In May 2022, this Court's motions panel granted Attorney Gurulé's motion to consolidate these three appeals.

Thereafter, in February 2023, Attorney Gurulé initiated Dillard's appeal, which was originally filed under Cause Number 23A-PC-261. The following month, March 2023, this Court's motions panel granted Attorney Gurulé's motion to consolidate Dillard's appeal with the three previously consolidated appeals concerning Tyson, Robinson, and Seabolt.

However, it is well-established that we have the inherent authority to reconsider a ruling by the motions panel while an appeal remains pending. *Beasley v. State*, 192 N.E.3d 1026, 1029 (Ind. Ct. App. 2022), *trans. denied*. Here, we have determined that a de-consolidation of these four appeals is necessary. Accordingly, we have returned each one to its original appellate cause number and will decide each appeal on its own merits. On August 11, 2023, we affirmed the post-conviction court's denial of Tyson's change of judge motion. *See Tyson v. State*, 217 N.E.3d 551 (Ind. Ct. App. 2023), *trans. pending*. On August 23, 2023, we affirmed the post-conviction court's denial of Robinson's change of judge motion. *See Robinson v. State*, No. 22A-PC-1102, 2023 WL 5420367 (Ind. Ct. App. Aug. 23, 2023), *trans. pending*. On September 20, 2023, we affirmed the post-conviction court's denial of Seabolt's change of judge motion. *See Seabolt v. State*, No. 22A-PC-208, 2023 WL 6141530 (Ind. Ct. App. Sept. 20, 2023), *trans. pending*.

prosecutorial misconduct, and whirlwind trials. Tragically, these unjust convictions often take decades to unravel, leaving innocent men and women to languish in prison for crimes they did not commit[.] Given the newly discovered evidence discussed below, [Dillard]'s conviction must be overturned and a new trial ordered. After 22 years of wrongful incarceration, [Dillard] deserves to be Elkhart's next exoneree.

(2023 App. Vol. 2 at 22, 23).[5]

[4]     Further, in this petition, Dillard argued that he was entitled to post-conviction relief because:

(1) he is actually innocent and has located newly discovered evidence materially relevant to his innocence that he could not with reasonable diligence have discovered and produced at trial; (2) he has new evidence demonstrating that the State's failure to disclose material exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Giglio*, 405 U.S. 150 (1972), materially affected his constitutional right to due process; and (3) he has new evidence demonstrating that the State relied upon perjured testimony at trial which could have impacted the judgment of the jury in violation of *Gordy v. State*, 270 Ind. 379, 385 N.E.2d 1145, 1146 (1979), *State v. Hicks*, 519 N.E.2d 1276, 1280-81 (Ind. Ct. App. 1988), *State v. Royer*, 166 N.E.3d 380, 404 (Ind. Ct. App. 2021), and *Napue v. Illinois*, 360 U.S. 264 (1959).

---

[5] On May 24, 2023, Dillard filed four volumes of appendices in the previously consolidated appeal. We will cite to these four volumes, which the Clerk of the Court has transferred to this appeal, as "2023 App." In addition, on September 7, 2022, Tyson, Robinson, and Seabolt filed ten volumes of appendices in the previously consolidated appeal. We will cite to these ten volumes, which the Clerk of the Court has also transferred to this appeal, as "2022 App."

(2023 App. Vol. 2 at 36). According to Dillard, "[t]o date, no court has considered this evidence[,] and [e]ach ground provides an independent basis for [the post-conviction court] to vacate the judgment and grant [Dillard] a new trial." (2023 App. Vol. 2 at 36).

[5] Also, in July 2022, Dillard filed a thirty-five-page motion for a change of judge pursuant to Indiana Post-Conviction Rule 1(4)(b). In this motion, Dillard specifically argued that the post-conviction court should grant his change of judge motion because the post-conviction court judge had been a deputy prosecutor in the Elkhart County Prosecutor's Office from 1998 until 2002, "during the time of the investigation of the Christopher Thomas homicide and Mr. Dillard's trial." (2023 App. Vol. 3 at 105). According to Dillard, he "intend[ed] to seek discovery from all prosecutors employed by the [Elkhart County Prosecutor's Office] at this time, including [the post-conviction court judge], [Vicki] Becker, [current Elkhart Circuit] Judge [Michael] Christofeno [("Judge Christofeno")], and Curtis Hill, and present this evidence in support of his claims that the [Prosecutor's Office] and [the Elkhart Police Department] have long had a pattern and practice of failing to disclose *Brady* evidence[.]" (2023 App. Vol. 3 at 106). Dillard further argued that because the post-conviction court judge had worked in the prosecutor's office during this time, she would be a "material witness in the case as well." (2023 App. Vol. 3 at 120).

[6] Dillard further argued that the post-conviction court should grant his change of judge motion because the post-conviction court judge had been married from

1992 until 2003 to Stephen Cappelletti ("Cappelletti"), who had been an Elkhart Police Department reserve police officer from 1983 through 1994. According to Dillard, Cappelletti would be "a critical witness in support of Mr. Dillard's claims of [Elkhart Police Department] police misconduct[.]" (2023 App. Vol. 3 at 101). Dillard also argued that the post-conviction court should grant his change of judge motion because the post-conviction court judge "sits on the same bench as [Judge] Christofeno, who is implicated in significant misconduct" in his role as a deputy prosecutor when he worked on Dillard's murder case more than twenty years ago. (2023 App. Vol. 3 at 117).

[7] In addition, Dillard argued that the post-conviction court should grant his motion for a change of judge because the post-conviction court's order in a prior unrelated case involving Andrew Royer ("Royer") had shown that the post-conviction court judge had "already prejudged allegations identical to Mr. Dillard's to be 'defamatory' and false, based not on the evidence, but the Court's own extrajudicial prejudices and beliefs." (2023 App. Vol. 3 at 112). Dillard also argued that because the post-conviction court had ultimately granted Royer's motion for a change of judge, the post-conviction court should grant Dillard's motion for a change of judge as well.

[8] At this point, for a better understanding of Dillard's argument and the post-conviction court's response to this argument in its order denying Dillard's motion for a change of judge, we find it helpful to review the facts and history of Royer's case. A jury convicted Royer of murdering Helen Sailor ("Sailor") in 2005. In 2006, this Court affirmed Royer's conviction. *Royer v. State*, No.

20A03-0601-CR-14, 2006 WL 1634766 (Ind. Ct. App. May 31, 2006). In 2007, Royer filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. This Court affirmed the denial. *Royer v. State*, No. 20A04-1106-PC-325, 2011 WL 6595351 (Ind. Ct. App. Dec. 20, 2011), *trans. denied*.

[9] A few years later, in June 2018, Royer, represented by Attorney Slosar, filed a motion for relief from judgment pursuant to Indiana Trial Rule 60(B). Immediately after filing this motion, Attorney Slosar and Royer's family members gathered in front of the prosecutor's office for a press conference. During the press conference, Attorney Slosar stated there was a "'systemic failure' and an 'epidemic' in Elkhart County where people [were] wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." (2022 App. Vol. 3 at 57). Attorney Slosar also stated that "these factors contributed to Andrew Royer being convicted of a murder that he is absolutely innocent of." (2022 App. Vol. 3 at 57). In addition, Attorney Slosar stated that "we have proven that [Royer's] conviction was an absolute fraud and the conviction was based on intentional misconduct." (2022 App. Vol. 3 at 57). Attorney Slosar further referred to the pending Trial Rule 60(B) motion as an appeal and released videotapes of witnesses that would be testifying at the hearing on Royer's motion.

[10] Following the press conference, the State filed a motion for an emergency hearing and a request for an injunction. In support of its motion, the State attached two newspaper articles from the South Bend Tribune. The headline

for one of the articles, which is dated June 13, 2018, is "Mentally disabled man says shoddy policing, false statements led to Elkhart murder conviction." (No. 20D03-0309-MR-155, Chronological Case Summary, June 19, 2018 entry). The headline for the other article, which is dated June 14, 2018, is "Attorney of Andrew Royer blasts Elkhart police for 'miscarriage of justice.'" (No. 20D03-0309-MR-155, Chronological Case Summary, June 19, 2018 entry). Royer filed a response to the State's motion. Following a hearing, the trial court judge in Royer's case, who is the post-conviction court judge in Dillard's case, issued an order that provides, in relevant part, as follows:

> 9. Additionally, Slosar contends that he made no statements that violate Ind. Professional Conduct Rule 3.6, as only information contained in the public record was stated at the press conference, along with matters he has a constitutional right to say on behalf of Royer. The Court carefully reviewed the State's Motion, as well as Royer's Response, along with the various attachments referencing news articles about the conference. Particularly troubling to the Court were Slosar's statements at the subject press conference characterizing "'systemic failure' and an 'epidemic' in Elkhart County where people are wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." Slosar went on to say that "these factors contributed to Andrew Royer being wrongfully convicted of a murder that he is absolutely innocent of." Slosar also stated that "we have proven that his conviction was an absolute fraud and the conviction was based on intentional misconduct." Additionally, videos of proposed witnesses were released and Slosar inaccurately referred to the pending Trial Rule 60(B) Motion filed in this Court as an "appeal."

10. The Indiana Supreme Court in *In re: Litz*[,] 721 N.E.2d 258 (Ind. 1999) addressed behavior such as [Slosar's] and held that Litz's publication of a letter in several local newspapers which state[d] his client committed no crime, criticized the prosecutor's decision to retry the case, and mentioned his client had passed a lie detector test constituted a violation of Ind. Professional Conduct Rule 3.6(a).[6]

11. In sum, Slosar's comments and statements are beyond the scope of the exceptions stated in Ind. Professional Conduct Rule 3.6(b) as to what a lawyer who is participating in litigation of a matter may state.[7] The statements are highly inflammatory, defamatory, inaccurately state the law as it exists at this time with respect to Royer's conviction, and draw legal conclusions about matters not yet adjudicated.

---

[6] Indiana Rule of Professional Conduct 3.6(a) provides as follows:

A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

[7] Indiana Rule of Professional Conduct 3.6(b) provides as follows:

Notwithstanding paragraph (a), a lawyer may state:

(1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved;
(2) information contained in the public record;
(3) that an investigation of a matter is in progress;
(4) the scheduling or result of any step in litigation;
(5) a request for assistance in obtaining evidence and information necessary thereto;
(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and
(7) in a criminal case, in addition to subparagraphs (1) through (6):
    (i) identity, residence, occupation and family status of the accused;
    (ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;
    (iii) the fact, time and place of arrest; and
    (iv) the identity of investigating and arresting officers or agencies and the length of the investigation.

Slosar's actions go beyond simply summarizing evidence that is a matter of public record. Further, any alleged "new evidence" must be heard in accordance with the judicial process before any legal conclusions may be reached. Essentially, the extrajudicial statements made by Slosar at the public press conference, and which were reported in the media, do exactly what the Rule prohibits - forming public opinion that has a substantial likelihood of materially prejudicing the adjudicative proceedings pending in this Court.

* * * * *

13. Here, the Court finds that the statements Slosar made at the public press conference held on June 13, 2018, violated Ind. Rule of Professional Conduct 3.6(a) in that they were extrajudicial statements that Slosar knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of prejudicing the adjudicative proceeding that is pending in this matter, specifically, his Trial Rule 60(B) Motion.

14. While the Court clearly recognizes Slosar's First Amendment right to free expression, as noted by the Indiana Supreme Court in the Commentary to Ind. Professional Rule of Conduct 3.6,[8] that right must be

---

[8] The commentary to Indiana Rule of Professional Conduct 3.6 provides, in relevant part, as follows:

It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital societal interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a

balanced with the right to fair and impartial legal proceedings, which may entail some restriction of the information that may be disseminated about a party prior to and during those proceedings. Ind. Professional Rule of Conduct 3.6 does not curtail free speech except to the extent necessary to protect the corresponding right to fair proceedings. This is the basis upon [which] the Court is acting.

15. For all these reasons, Slosar is hereby enjoined from making extrajudicial commentary and statements to the extent explained in Ind. Professional Rule of Conduct 3.6 on the matter that is pending before this court. Failure to comply with this Order will be deemed willful failure to comply with Ind. Professional Conduct Rule 3.6 and is subject to appropriate sanctions.

(2022 App. Vol. 3 at 56-59). Also, in the order, the trial court noted that Attorney Slosar had argued that Indiana Rule of Professional Conduct 3.6 had not applied to this case because no trial had been pending. The trial court responded that it disagreed with Attorney Slosar's "over[-]simplification of the intent of the Rule" and found that "the clear and express language of paragraph (a) is that dissemination of extrajudicial statements that will have a likelihood of materially prejudicing **an adjudicative proceeding** (Emphasis added) is prohibited. Indeed, that language, as well as 'legal proceedings' is used

---

legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

throughout the Rule, the Commentary, and in case law." (2022 App. Vol. 3 at 56).

[11] In August 2018, Royer filed a motion to withdraw, without prejudice, his Trial Rule 60(B) motion, which the trial court granted. In May 2019, Royer filed a motion for permission to file a successive petition for post-conviction relief, which this Court granted. Royer then filed a successive petition for post-conviction relief and a motion for change of judge. The post-conviction court judge, who had issued the order finding that Attorney Slosar had violated Indiana Rule of Professional Conduct 3.6(a), granted Royer's motion for a change of judge.

[12] Royer's case was subsequently assigned to Kosciusko Superior Court Judge Joe V. Sutton ("Judge Sutton"), who held a four-day hearing on Royer's successive petition for post-conviction relief in October and November 2019. Following the hearing, Judge Sutton issued a fifty-five-page order granting Royer's successive petition for post-conviction relief and vacating Royer's murder conviction based on newly discovered evidence and *Brady* violations.

[13] Judge Sutton specifically found newly discovered evidence that Elkhart County Forensic Specialist Dennis Chapman ("Forensic Specialist Chapman") had not been qualified to conduct the latent fingerprint comparisons that he had made

in Royer's case.[9] Judge Sutton noted that then-Elkhart County Chief Deputy Prosecutor Vicki Becker ("Deputy Prosecutor Becker")[10] had been responsible for meeting with Forensic Specialist Chapman and preparing him to testify. However, Judge Sutton found that Deputy Prosecutor Becker had not been provided with Forensic Specialist Chapman's resume and had not been told that he was not qualified to conduct comparisons of latent prints. Judge Sutton further found that Forensic Specialist Chapman had "misled [Deputy Prosecutor] Becker into believing that he was qualified to conduct the type of latent print comparisons that [had] exist[ed]" in the case. (2022 App. Vol. 3 at 69). Judge Sutton also found a *Brady* violation because Forensic Specialist Chapman's lack of qualifications had not been disclosed to the defense.

[14] Judge Sutton further found newly discovered evidence that Detective Carl Conway ("Detective Conway"), the lead investigator in the Sailor homicide, had been removed from the homicide unit before Royer's trial. The reason for Detective Conway's removal was a misrepresentation that he had made to an attorney regarding one of the attorney's clients.[11] Based upon this

---

[9] In 2012, the Elkhart County Sheriff's Department disciplined Forensic Specialist Chapman for his role in Royer's case. Forensic Specialist Champman retired in 2013.

[10] Vicki Becker is currently the elected Elkhart County Prosecutor.

[11] Judge Sutton further explained that Detective Conway's appeal of his removal from the homicide unit had been summarily denied. In addition, Detective Conway had later been removed from the sex-crimes unit. According to Judge Sutton, during that removal process, Detective Conway had "made a complaint to [Deputy Prosecutor Becker]. A disciplinary proceeding ensued that resulted in an agreement between [Detective] Conway and the Elkhart Police Department. As part of that agreement, the Elkhart Police Department agreed to withdraw any allegations alleging or suggesting that 'he caused the Office of the Prosecuting Attorney to lose faith in the Elkhart Police Department or to question its ability to supervise its

misrepresentation, Detective Conway's supervisors had concerns about the impact that his misrepresentations would have on future homicide investigations and his credibility at trials if called to testify. However, Detective Conway's removal from the homicide unit had not been disclosed to Royer before trial. Judge Sutton further found a *Brady* violation because the Elkhart Police Department had not disclosed Detective Conway's removal to the defense.

In addition, Judge Sutton found newly discovered evidence that Detective Conway had threatened a critical witness in Royer's case and had promised her $2,000 to falsely testify against Royer at trial. Judge Sutton further found that the witness' recantation of her trial testimony at the post-conviction hearing and her explanation for how her statement had been crafted were both credible. In addition, Judge Sutton found a *Brady* violation because the coercion of the witness and the fabrication of her testimony had not been disclosed to the defense.

Judge Sutton further found newly discovered evidence that Royer's two audio-recorded statements obtained on September 3 and September 4, 2003, which totaled approximately sixty-one minutes, were unreliable and involuntary. Judge Sutton specifically noted that Detective Conway had interrogated Royer for approximately seven and one-half hours and that there was newly

_____

detectives, investigate sex crimes or to perform any other form of police activities.' In exchange, Detective Conway accepted a written reprimand." (2022 App. Vol. 3 at 83-84 n.7).

discovered evidence that Detective Conway had a reputation for obtaining confessions from every suspect that he had interrogated while assigned to the homicide unit. In addition, Judge Sutton found newly discovered evidence that Detective Conway's ability to obtain confessions had not been a direct result of his internal interrogation training at the Elkhart Police Department. Judge Sutton further found newly discovered evidence that the Elkhart Police Department had not provided Detective Conway with any meaningful training on how to conduct interrogations, including how to interrogate a suspect such as Royer, who suffered from a mental disability. Judge Sutton also found that although Detective Conway had been aware of Royer's mental disability, Detective Conway had not used any protections to safeguard against the possibility of Royer giving false and unreliable statements. Judge Sutton specifically pointed out that although another member of the homicide unit had told Detective Conway that the Elkhart Housing Authority had documentation revealing that Royer was severely disabled and had the mind of a child, Royer had not been permitted to have a lawyer, counselor, or family members present for his interrogations on September 3 and 4.

[17] In addition, Judge Sutton found newly discovered evidence that Royer had not knowingly and voluntarily waived his *Miranda* rights because Detective Conway had not properly taken the time to advise Royer of these rights. Judge Sutton also found newly discovered evidence that Detective Conway had "repeatedly provided information about the homicide to Mr. Royer throughout the unrecorded two-day interrogation sessions." (2022 App. Vol. 3 at 101). In

addition, Judge Sutton found newly discovered evidence that although Detective Conway revealed at the successive post-conviction hearing that Royer's "mental well-being [had] broke[n] down[]" during the interrogations, Detective Conway had taken Royer's recorded statement and placed him under arrest. (2022 App. Vol. 3 at 103). Royer had been "in such a state of confusion that Detective Conway had to remind him that he [had given] a confession and was under arrest." (2022 App. Vol. 3 at 103).

[18] Judge Sutton also found newly discovered evidence that the Elkhart Police Department's investigation into Royer's statements corroborated their unreliability. (2022 App. Vol. 3 at 104). Specifically, Detective Conway acknowledged that he was only able to corroborate the following two basic pieces of information from all of Royer's statements: (1) Royer knew the other person who had been charged with killing Sailor; and (2) Royer lived in the same building as Sailor. Further, many of the details in Royer's recorded statements conflicted with the physical evidence.

[19] Based on these extensive findings, including newly discovered evidence and *Brady* violations, Judge Sutton vacated Royer's murder conviction after concluding that he was entitled to a new trial. We note that although Judge Sutton found several *Brady* violations, Judge Sutton's order does not specifically state that Deputy Prosecutor Becker or any other prosecutor had known about

Detective Conway's misconduct or had purposely withheld evidence from the defense.[12]

[20] On appeal, we affirmed Judge Sutton's grant of Royer's successive petition for post-conviction relief and vacation of Royer's murder conviction. *Royer*, 166 N.E.3d at 380. We specifically highlighted instances of Detective Conway's misconduct and concluded that Royer had not received a fair trial. Like Judge Sutton, we did not state that Deputy Prosecutor Becker or any other prosecutor had known about Detective Conway's misconduct or had purposely withheld evidence from the defense.

[21] We now return to the facts in Dillard's appeal. As stated above, Dillard filed a thirty-five-page change of judge motion in July 2022. The trial court held a hearing on Dillard's change of judge motion in October 2022. At the hearing, the State, which had not filed a written response to Dillard's change of judge motion, argued that Dillard had presented "no viable legal argument which would call for the [post-conviction] court [judge] to recuse [her]self[.]" (Tr. Vol. 2 at 23).

[22] In November 2022, the post-conviction court issued an eleven-page order denying Dillard's change of judge motion. This order provides, in relevant part, as follows:

---

[12] "For *Brady* purposes, the prosecutor is charged with knowledge of information known by the police even if the prosecutor herself is unaware of the information." *Royer*, 166 N.E.3d at 400.

15. [Dillard's] on-going claim that this Court is unable to be impartial because the Judge held a position as a Deputy Prosecutor in the Elkhart County Prosecutor's Office from 1998-2002, and as such, would have served in the capacity during the same time period as elected Elkhart County Prosecutor, Vickie Becker, is not supported by any facts or evidence. The working relationship between the Court and Ms. Becker was always professional in nature, and was not as [Dillard] suggests a "special" or "extraordinary" relationship. The same is true with respect to the Court's contacts with law enforcement officers and deputy prosecutors. Those working relationships were not in the nature of private friendships or of particular closeness so as to infringe on impartiality. This Judge interacted with Ms. Becker as would any deputy prosecuting attorney, as professional colleagues. This Court does not recall any specific involvement in [Dillard]'s case at all.

16. The same is true of Curtis Hill and the Hon. Michael Christofeno. Never was the Court involved in any extra judicial connection with either of them except on an intermittent basis. [Dillard]'s opinion that this Court and the Hon. Michael Christofeno share the "same bench" is not accurate. Elkhart Circuit Court and this Court are separate and distinct courts within Elkhart County. There is nothing in the record of this case that is of any legitimate concern or that presents an appearance of impropriety as to the workings of the courts. Just as other Petitioners being represented by these common counsel have not previously demonstrated personal bias or prejudice on the part of this Court, [Dillard] has not presented any evidence to support how this Court's prior employment as a deputy prosecuting attorney, or its relationship with other courts or judicial officers impacts this Court's ability to be impartial.

17. [Dillard] has included in his Motion for Recusal certain detail about this Court's former marriage to a former Elkhart Police Department Reserve Officer, and argues that this relationship surely renders this Court bias[ed] because the ex-husband was allegedly involved in certain wrongdoing; therefore, the Court must have been privy to and accepted or engaged in the conduct itself. This Court has already addressed this issue regarding her former husband in previous orders wherein all of the same arguments raised by [Dillard] in his current Motion were raised. The arguments were specifically and expressly addressed and explained by the Court. (*See, Order, dated April 29, 2022, denying Petitioner's Renewed Motion for Recusal in the case of Leon Tyson v. State, Cause No. 20D03-1807-PC-000037*), which the Court takes judicial notice of and incorporates herein[.][13]

---

[13] In the *Tyson* case, the post-conviction court judge, who is the post-conviction court judge in Dillard's case, stated as follows in her order denying Tyson's renewed motion for recusal:

In his Renewed Motion for Recusal, [Tyson] alleges that this Court must recuse in the pending post conviction case because the Judge was married to an Elkhart Police Department reserve officer, Stephen Cappelletti ("Cappelletti"), from June 6, 1992 through April 15, 2003, and that Cappelletti had close ties to a group of officers who framed [Tyson] and was involved in police misconduct similar to that alleged in [Tyson]'s Post Conviction Relief Petition. Cappelletti was with the Elkhart Police Department part time from 1983-1994; therefore, during most of that time, this Judge was not married to him. Also, any direct allegation of misconduct by Cappelletti as espoused by Tyson in his Renewed Motion allegedly occurred in 1989, prior to the marriage. Cappelletti did not work at the Elkhart Police Department at any time when an investigation would have ensued in [Tyson]'s case. Cappelletti's employment with the Elkhart Police Department ended in 1994. Tyson was charged with the offense of Murder on December 7, 2015, and was convicted on January 26, 2017. That Cappelletti was involved in any investigation of [Tyson]'s case between 1994 and 2003 and would have shared information with this Court about a murder that did not occur until June 20, 2015 is not only incredulous, but impossible. Moreover, this Judge had been divorced from Cappelletti for over twelve (12) years when [Tyson] was charged and had no contact with him thereafter. Further, to suggest that any of the activities or attitudes [Tyson] avers Cappelletti and/or his associates engaged in or believed somehow means that this Court must also condone such activities and harbor such beliefs based on the marriage many years earlier is entirely without merit. Even if Cappelletti remained friends with former Elkhart Police Officers,

18. Petitioner Dillard also alleges that this Court's findings in the case of <u>State v. Andrew Royer</u>, in Cause No. 20D03-0309-MR-0155, regarding the conduct of attorney Eliot Slosar and the ultimate entry of an injunction against Mr. Slosar, calls into question the ability of the presiding Judge to remain unbiased and impartial in the instant case. Specifically, [Dillard] complains that because this Court previously found comments and allegations by Mr. Slosar to be "defamatory," the Court formed opinions on the

---

that does not implicate this Court. Contrary to [Tyson]'s contention, the Judge's former marriage does not provide "corroborative detail" that this Court cannot impartially assess the credibility of witnesses who may be associated with police officers in general and their alleged misconduct. Moreover, [Tyson] has failed to demonstrate how this Court's ex-husband bears any nexus to [Tyson]'s post-conviction matter. Other than a shared employment status many years ago with individuals accused of wrongdoing who may or may not testify in this case, there is no connection at all. [Tyson] has not shown that this Judge was witness to or adheres to anything that would comprise his post conviction case[.]

In the instant case, there is no evidence that this Court's former marriage to an Elkhart Police Department reserve officer in any way ever swayed the Judge's decision making or does so today nineteen (19) years post-divorce. Cappelletti stopped working for the Elkhart Police Department in 1994, twenty-one (21) years prior to [Tyson]'s offense. It is unlikely that Cappelletti himself obtained any information about [Tyson]'s case, let alone imparted such knowledge to this Court. This Judge has no knowledge derived from extrajudicial sources stemming from her marital relationship with Cappelletti about [Tyson]'s case that could demonstrate personal prejudice or bias against [Tyson] in this post conviction proceeding. [Tyson] has failed to draw any valid connection between his case, Cappelletti and this Court other than self serving commentary that Cappelletti may be a critical witness to a pattern and practice of alleged police misconduct at the Elkhart Police Department. [Tyson], however, has not articulated any meaningful argument as to how Cappelletti, a reserve Elkhart Police Department officer until 1994, constitutes a critical witness to [Tyson]'s 2017 conviction. [Tyson] makes a final claim that this Court had an obligation to disclose her past marriage to Cappelletti under Rule 2.11 Code of Judicial Conduct, n.5. Honestly, why it would cross the mind of the Court to disclose that she was once married to a man who served as a reserve Elkhart Police Department officer for approximately two (2) years while they were married and whom the Court divorced some nineteen (19) years ago is wholly untenable. This was not information that this Judge should be expected to believe the parties or their lawyers might reasonably consider relevant to a motion for disqualification. [Tyson]'s argument in this regard is not persuasive and recusal is not required.

*Tyson*, 217 N.E.3d at 566-67.

merits of Royer's case. Therefore, [Dillard] avers that this Judge is duly biased and unfit to preside over the current post conviction case in which [Dillard] raises similar allegations. However, [Dillard] misstates the issue addressed by the Court in Royer by stating that the Court found that the allegations of "systemic failure" in Elkhart County leading to the wrongful convictions were false; and, that Royer's counsel knowingly or recklessly made false statements about the causes of Royer's convictions. [Dillard] further averred that this Court reached these conclusions without hearing the testimony of a single witness or considering any evidence in the Royer case.

19. This Court has previously addressed in full the facts attendant to its July 3, 2018 Order in the Royer case, (*See, Order dated September 8, 2001 in the case of Tyson, supra*), and reiterates that reasoning here. A review of the actual Order entered on July 3, 2018 clearly shows that [Dillard]'s characterization of the proceedings in Royer is wrong. That matter came on for hearing on the State's Motion for Emergency Hearing and Request for Injunction based on Mr. Slosar holding a press conference outside the Prosecutor's Office in downtown Elkhart, Indiana, during which he made a number of comments about Royer's then pending Ind. Trial Rule 60(B) motion. Specifically, at the time the Court issued its July 3, 2018 Order, the statements made by Mr. Slosar to the press characterized "'systemic failure' and an 'epidemic' in Elkhart County where people are wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." Slosar went on to say that "these factors contributed to Andrew Royer being wrongfully convicted of murder that he is absolutely innocent of." Slosar also stated that "we have proven that his conviction was an absolute fraud based on intentional misconduct." The Court found Slosar's statements to be beyond the scope of the exceptions stated in Ind.

Professional Conduct Rule 3.6(b), as well as inflammatory and defamatory as they inaccurately stated the law as it existed at that time with respect to Royer's conviction, and inappropriately drew legal conclusions about matters that had not yet been adjudicated. (*Court's July 3, 2018 Order*).

20. [T]he Court carefully reviewed the [State's Motion for an Emergency Injunction] and Royer's response, along with numerous attachments; therefore, the Court did consider evidence and testimony relevant to the Motion before it. Royer's 60(B) Motion was not before the Court; the State's Motion for an Emergency Injunction was. Royer's 60(B) Motion was pending, and . . . nothing had been proven, and there was no ruling on the merits of that Motion; therefore, Mr. Slosar's statements to the public and media were blatantly inappropriate and false. In his Motion for Recusal, [Dillard] is attempting to frame the issues addressed in the Court's July 3, 2018 Order in the Royer case nearly three (3) years ago to serve his own purpose in the instant case. However, the facts surrounding the Court's finding and entry of an injunction in the Royer case are in no way present, relevant or even similar to the instant case and that argument is without merit.

\* \* \* \* \*

22. [Dillard]'s attempts to cite Andrew Royer's subsequent successful post conviction action decided in 2021 as evidence that counsel's statements in 2018 were true and an absolute defense to the Judge's characterization of attorney Slosar's comments as defamatory also fail. Although [Dillard] is correct that Andrew Royer ultimately prevailed on his post conviction action, that fact was not established when the Court ruled in the 2018 injunction case and has absolutely no bearing on the instant case. Relying on the Court's previous ruling as evidence of personal bias on the part of the presiding Judge erroneously treats the Court's finding that counsel

violated Ind. Rule of Professional Conduct 3.6(a) as pertaining to substantive issues in Royer's post conviction case. Clearly, the Court's Order of July 3, 2018 does not support a rational inference of personal bias *toward Petitioner Reginald Dillard*. The Court's July 3, 2018 injunction in the Royer case was issued on a very narrow set of circumstances, and the impetus behind the Court's Order was to prevent conclusions from being reached without a full adjudication on the evidence, ensure the integrity of the litigation and circumscribe maneuvers that might prejudice the pending adjudicative proceedings. It cannot be said that an objective person with knowledge of those circumstances would doubt the impartiality of the Judge in the instant case. Andrew Royer's success in his post conviction case has no bearing on the instant case simply because [Dillard] is again claiming the same alleged "systemic failure." There is no factual connection between Royer and the instant case at all, let alone a connection warranting recusal of the presiding Judge. In fact, Royer's success on his individual post conviction petition does not unequivocally demonstrate the presence of what [Dillard] frames as "systemic" misconduct in Elkhart County.

23. Finally, [Dillard]'s argument that this Court must recuse because the Judge may be subpoenaed as a witness is purely speculative at this time and whether that would ever come to fruition remains to be seen as simply making that attempt does not automatically mean such an endeavor would be successful. The allegation is certainly not enough to warrant the recusal of the Court now.

24. In sum, [Dillard] has made no viable legal argument that would require this Court to recuse. [Dillard] relies on what he characterizes as facts, but which are actually vague, speculative opinions and attacks on the Court. For all the herein stated reasons, this Court concludes that

> [Dillard] had not met his burden of overcoming the presumption that this Judge is unbiased and unprejudiced with respect to [Dillard]'s pending post-conviction proceeding.

(2023 App. Vol. 4 at 17-23) (emphasis added) (footnote omitted).

[23] In January 2023, the post-conviction court certified its order for interlocutory appeal. In its certification order, the post-conviction court stated as follows:

> The Court believes that its Order denying recusal in this case demonstrates that the Court took great care to research and address each of [Dillard]'s arguments, and appropriately applied well-settled case law regarding recusal in determining that no actual bias had been shown and that recusal is not warranted[.]

> Notwithstanding the foregoing, the Court believes that substantial questions of law do exist as to the appropriateness of [Dillard] repeatedly raising irrelevant matters outside this case, whether [Dillard] has incorrectly interpreted previous Orders issued by this Court in another unrelated case, and proceeding to wrongfully perpetuate an argument based on that misinterpretation, and whether [Dillard] has drawn conclusions not based on facts and evidence in this case in support of his position that this Court harbors bias and prejudice against him; and, therefore, is unable to render an impartial decision in his post conviction proceeding. With respect to these matters, the Court finds that early resolution would promote a more orderly disposition of the case and promote judicial economy and resources. While this appeal will by no means resolve the pending post conviction litigation, it will resolve the important threshold issue of judicial recusal before the case proceeds on the merits.

> Therefore, in this regard, the Court sees no reason to deviate from its inclination to certify the Order denying recusal in this case for the same reasons as those articulated in previous similar

cases, to-wit to gain guidance and clarification from the Court of Appeals with respect to [Dillard]'s allegations for recusal which this Court believes are based on misinterpretation and mischaracterization of the facts and unfounded conclusions that this Court harbors actual bias based on tenuous, speculative and specious claims not supported by the facts.

(2023 App. Vol. 4 at 25-26). In March 2023, this Court accepted jurisdiction over Dillard's interlocutory appeal. In addition, this Court's motions panel granted Dillard's motion to consolidate his case with the three previously consolidated cases, which, as explained above, we have de-consolidated.

[24] Dillard now appeals the denial of his motion for a change of judge in his post-conviction case.

# Decision

[25] Dillard argues that the post-conviction court clearly erred when it denied his motion for a change of judge. We disagree.

[26] At the outset, we note that the law is well-settled that "adjudication by an impartial tribunal is one of the fundamental requirements of due process imposed on the courts of this state by the Fourteenth Amendment to the federal constitution." *Matthews v. State*, 64 N.E.3d 1250, 1253 (Ind. Ct. App. 2016) (citing *Tumey v. Ohio*, 273 U.S. 510, 535 (1927)), *trans. denied*. Judges are presumed impartial and unbiased. *Matthews*, 64 N.E.3d at 1253. "'[T]he law will not suppose a possibility of bias or favor in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that

presumption and idea.'" *Matthews*, 64 N.E.3d at 1253 (quoting 3 William Blackstone, *Commentaries* *361)).

[27] In post-conviction cases, parties seeking to overcome the presumption of judicial impartiality must move for a change of judge under Post-Conviction Rule 1(4)(b). That rule provides, in relevant part, as follows:

> Within ten (10) days of filing a petition for post-conviction relief under this rule, the petitioner may request a change of judge by filing an affidavit that the judge has a personal bias or prejudice *against the petitioner*. The petitioner's affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. A change of judge shall be granted if the historical facts cited in the affidavit support a rational inference of bias or prejudice.

(Emphasis added).

[28] This rule requires the judge to examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice. *Pruitt v. State*, 903 N.E.2d 899, 939 (Ind. 2009). A change of judge is neither automatic nor discretionary but calls for a legal determination by the post-conviction court. *Id.* We presume that the post-conviction court is not biased against a party and disqualification is not required under the rule unless the judge holds a "personal bias or prejudice." *Id.* (quoting P.-C.R. 1(4)(b)). Typically, a bias is personal if it stems from an extrajudicial source, which means a source separate from the evidence and

argument presented at the proceedings. *Pruitt*, 903 N.E.2d at 939. "Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before [her]." *L.G. v. S.L.*, 88 N.E.3d 1069, 1073 (Ind. 2018).

"Further, Indiana courts credit judges with the ability to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons." *Id.* In addition, "[a] showing of prejudice sufficient to support a motion for a change of judge must be established from personal, individual attacks on a defendant's character, or otherwise." *Miller v. State*, 106 N.E.3d 1067, 1076 (Ind. Ct. App. 2018), *trans. denied*. Stated differently, "a motion for a change of judge should be granted only if the evidence reveals such a high degree of favoritism or antagonism as to make a fair judgment impossible." *State v. Shackleford*, 922 N.E.2d 702, 707 (Ind. Ct. App. 2010) (cleaned up), *trans. denied*.

The ruling on a motion for change of judge is reviewed under the clearly erroneous standard. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). Reversal will require a showing which leaves us with a definite and firm conviction that a mistake has been made. *Id.*

We restate Dillard's first argument as whether the post-conviction court clearly erred in denying his motion for change of judge because the post-conviction court's 2018 order in the unrelated Royer case finding that Attorney Slosar had violated Rule of Professional Conduct 3.6(a) supports a rational inference of

bias or prejudice against Dillard.[14] "Prior judicial rulings generally do not support a rational inference of prejudice." *Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006). "Adverse rulings and findings by a trial judge from past proceedings with respect to a particular party are generally not sufficient reasons to believe the judge has a personal bias or prejudice." *Id*. Although the mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing, there may be circumstances in which a rational inference of bias or prejudice may be established if a judge's order is sufficiently egregious. *Id*.

[32] Here, however, we find nothing egregious in the July 2018 order that the trial court judge, who is the post-conviction court judge in Dillard's case, issued in the unrelated Royer case. Rather, the trial court simply concluded that Attorney Slosar's press conference statements regarding systemic police misconduct in Elkhart, which he had made before the adjudication of Royer's Trial Rule 60(B) motion, violated Rule of Professional Conduct 3.6(a). Further,

---

[14] We note that Dillard asserts that in *Royer*, 166 N.E.3d at 380, this Court found systemic police and prosecutorial misconduct in Elkhart. We did not. Specifically, we find no language in our opinion in *Royer* to support such an interpretation. Rather, our review of our opinion in *Royer* reveals that the newly discovered evidence related primarily to the horrific conduct of one Elkhart Police Department detective.

Dillard also asserts that in its July 2018 order in the Royer case, the post-conviction court found that there was no systemic police or prosecutorial misconduct in Elkhart. It did not. The post-conviction court's order in the Royer case solely addressed the statements that Attorney Slosar made at a press conference after he had filed in Royer's case a motion for relief from judgment pursuant to Indiana Trial Rule 60(B). Specifically, the post-conviction court found that Attorney Slosar's statements violated Rule of Professional Conduct 3.6(a) because Attorney Slosar knew or reasonably should have known that these statements would be disseminated by means of public communication and would have a substantial likelihood of prejudicing the adjudicative proceeding that was pending in the matter.

and more importantly, the trial court's July 2018 order does not mention Dillard or anything about Dillard's case. In sum, we find nothing in the Royer order that supports a rational inference of bias or prejudice *against Dillard*.[15]

[33] We restate Dillard's second argument as whether the post-conviction court clearly erred in denying Dillard's motion for a change of judge because the post-conviction court's 1998-2002 tenure as a deputy prosecutor supports a rational inference of bias or prejudice against Dillard. In *Calvert v. State*, 498 N.E.2d 105, 107 (Ind. Ct. App. 1986), this Court concluded "that a trial judge must disqualify [her]self from a proceeding in which [s]he has actively served as an attorney for one of the parties regardless of whether actual bias or prejudice exists." Here, although the post-conviction court judge worked in the prosecutor's office during the investigation of Thomas' murder and during Dillard's murder trial, Dillard does not allege that the post-conviction court judge actively served as a deputy prosecutor on Dillard's case. Rather, Dillard claims that the post-conviction court should grant his change of judge motion because he intends to seek discovery from all the prosecutors who worked at the

---

[15] We further note that Dillard's argument that the post-conviction court should have granted his motion for a change of judge because it granted the motion for a change of judge in the Royer case is unavailing. Specifically, the fact that the post-conviction court granted a motion for a change of judge in Royer's case "appears to us to evidence the fact that [the post-conviction court judge] would conduct herself as an unbiased jurist in applying the law to the particular facts of a case." *Smith v. State*, 613 N.E.2d 412, 414 (Ind. 1993) (affirming the trial court's denial of a motion for a change of judge where the petitioner argued that the adverse publicity that the post-conviction court received as a result of granting an unrelated petition for post-conviction relief would cause the post-conviction court to be biased against granting post-conviction relief in petitioner's case), *cert. denied*.

Elkhart County Prosecutor's Office during that investigation and trial and that, therefore, the post-conviction court judge will be a material witness at Dillard's post-conviction hearing. However, we agree with the State that Dillard's intent "to depose every prosecutor that was in the office[]" during that time establishes that the post-conviction court "would not possess unique information about the prosecutor's office's knowledge on this subject and that [Dillard] has other means of learning this information." (State's Br. 14). *See Stevens v. State*, 770 N.E.2d 739, 763 (Ind. 2002) (affirming the post-conviction court's denial of petitioner's change of judge motion where petitioner intended to interview the post-conviction court regarding a trial issue and the post-conviction court concluded that "there [were] ample witnesses who c[ould] testify about those conversations . . . without the requirement of calling the trial judge as a witness to add . . . perhaps cumulative testimony"), *cert. denied*. Indeed, we further agree with the State that "Dillard's intention to engage in a fishing expedition to determine the knowledge of every prosecutor who worked in the office during the relevant time period alone demonstrates that [the post-conviction court judge] is not a material witness." (State's Br. 14). Dillard has failed to show the post-conviction court's 1998-2002 tenure as a deputy prosecutor supports a rational inference of bias or prejudice *against Dillard*.[16]

---

[16] Dillard also contends that more than twenty years ago, when the post-conviction court judge was a deputy prosecutor, the post-conviction court judge "worked with Vicki Becker on a robbery prosecution of an Elkhart man named Blease White" and failed to disclose *Brady* evidence to White. (Dillard's Br. 17). Dillard appears to believe this is an historical fact that supports a rational inference of bias or prejudice. However, as we noted in the *Seabolt* case, this is not an accurate statement of the facts. Specifically, our review of the

[34]    Lastly, we restate Dillard's third argument as whether the post-conviction court clearly erred in denying Dillard's motion for a change of judge because the post-conviction court judge's 1992-2003 marriage to Cappelletti supports a rational inference of bias or prejudice against Dillard. The post-conviction court judge's marriage to Cappelletti ended more than twenty years ago, and Dillard's affidavit does not allege that any relationship existed between Cappelletti and the post-conviction court judge after their marriage had been dissolved. Indeed, in her order denying Dillard's motion for a change of judge, the post-conviction court judge specifically noted that she had not had contact with Cappelletti since their marriage had been dissolved in 2003. Given the remoteness in time of the post-conviction court judge's marriage to Cappelletti, Dillard has failed to show that this prior marriage supports a rational inference of bias or prejudice *against Dillard. See Bloomington Magazine*, 961 N.E. 2d at 66. *See also McKinney*

---

record in *Seabolt* revealed that the post-conviction court judge had not worked on the White case with Becker. Rather, the post-conviction court judge attended one hearing for Becker on November 30, 2000, at which time the only action taken was the setting of a jury trial date. Dillard has failed to show that the post-conviction court judge's attendance at this hearing supports a rational inference of bias or prejudice against Dillard.

Dillard further alleges that the post-conviction court judge's "close friendship with Vicki Becker, [who is] representing the State in Mr. Dillard's case[]," supports a rational inference of bias or prejudice against Dillard. (Dillard's Br. 16). However, Dillard's allegation that the post-conviction court judge and Becker are close friends is based on the fact that when they worked together at the prosecutor's office more than twenty years ago, they went to dinner together and talked on the phone. Dillard has neither alleged nor presented any evidence that the alleged friendship that existed between the post-conviction court judge and Becker continued after the post-conviction court judge left the prosecutor's office. A prior friendship that existed twenty years ago simply does not support a rational inference of bias or prejudice against Dillard. *See Bloomington Magazine, Inc. v. Kiang*, 961 N.E.2d 61, 66 (Ind. Ct. App. 2012) (explaining that the proximity in time of the historical facts alleged in the affidavit to the matter concerning the motion for a change of judge is a relevant inquiry).

*v. State*, 873 N.E.2d 630, 640 (Ind. Ct. App. 2007) (explaining that where the personal relationship between the trial court judge and her former employee, who was the murder victim's mother, had ended twenty years before the defendant's trial and the defendant had not alleged any facts suggesting that any relationship existed between the two after that employment had been terminated, the trial court did not clearly err in denying defendant's motion for a change of judge), *trans. denied*.[17]

## Conclusion

[35] In sum, the recited historical facts on which Dillard based his motion for a change of judge simply do not support a rational inference of bias or prejudice *against Dillard* as contemplated by Post-Conviction Rule 1(4)(b). We further

---

[17] Dillard further argues that the post-conviction court judge "cannot preside over a case where her judicial colleague, [Judge Christofeno,] is a key witness implicated in misconduct." (Dillard's Br. 28). In support of this argument, Dillard contends that "[c]ourts have repeatedly held that recusal is necessary where a judge's judicial colleague is a witness." (Dillard's Br. 28). However, Dillard misinterprets the authority that he cites in support of this contention. Specifically, Dillard directs us to three federal district court cases where the trial court judges granted the defendants' motions for a change of judge. These cases do not "hold" that recusal is necessary where a judge's judicial colleague is a witness. Rather, they are simply the three judges' decisions to recuse based on the specific facts of the cases. *See U.S. v. O'Brien*, 18 F.Supp.3d 25 (D. Mass. 2014); *U.S. v. Gordon*, 354 F.Supp.2d 524 (D. Del. 2005); *U.S. v. Singer*, 575 F.Supp. 63 (D. Minn. 1983).

Here, we note that Dillard has neither alleged nor shown that the post-conviction court judge, who is an Elkhart Superior Court judge, and Judge Christofeno, who is an Elkhart Circuit Court judge, share a personal friendship or even a close professional relationship. In addition, Dillard has neither alleged nor shown that either of the judges supervise, is subordinate to, or is somehow responsible for the work of the other. We further note that Dillard has not alleged that Judge Christofeno has committed misconduct as a judicial officer. Rather, Dillard's allegations of professional misconduct against Judge Christofeno concern incidents that occurred more than twenty years ago when Judge Christofeno was a deputy prosecutor. Based on the foregoing, and mindful of the presumption that judges are impartial and unbiased, *see Matthews*, 64 N.E.3d at 1253, we conclude that the post-conviction court did not clearly err in denying Dillard's change of judge motion.

note that the post-conviction court has neither expressed an opinion on the merits of Dillard's case nor attacked his character. Accordingly, because we are not left with a definite and firm conviction that a mistake has been made, we conclude that the post-conviction court did not clearly err in denying Dillard's motion for a change of judge. *See Garland*, 788 N.E.2d at 433. We, therefore, affirm the post-conviction court's denial of Dillard's motion. *See Pruitt*, 903 N.E.2d at 939 (explaining that where Pruitt's affidavit in support of his motion for a change of judge had shown no historical facts that had demonstrated personal bias on the part of the post-conviction court judge, Pruitt had been provided with a full and fair post-conviction relief hearing before an impartial judge).

[36] Affirmed.

Crone, J., and Bradford, J., concur.